DRISCOLL, APPELLEE, *v.* BLOCK; TOLEDO BLADE CO., APPELLANT.

[Cite as Driscoll v. Block, 3 Ohio App. 2d 351.]

(No. 5919—Decided September 29, 1965.)

*Mr. Melvin M. Belli* and *Mr. William D. Driscoll*, for appellee.

*Mr. Dan H. McCullough* and *Messrs. Marshall, Melhorn, Bloch & Belt*, for appellant.

SKEEL, J.   This appeal comes to this court on questions of law from a judgment entered for the plaintiff on the verdict of a jury in the Court of Common Pleas of Lucas County.   The plaintiff, during the time encompassed in his petition, was a Judge of the Municipal Court of the city of Toledo, Ohio, and was then a candidate for election to succeed himself, he having been appointed to fill an un-expired term.   The defendant, Toledo Blade Co., an Ohio corporation, was the publisher of two newspapers of general circulation in Toledo and extending beyond the city, it being alleged that it has some international circulation.   The defendant, Paul Block, Jr., is President of the Toledo Blade Co.   The claims against Paul Block, Jr., will be omitted for the reason that upon motion at the end of plaintiff's case he was dismissed from the action.   The action is one seeking damages for alleged libels published in the newspapers of the defendant, Toledo Blade Co.

The plaintiff's second amended petition presents three causes of action, each cause of action being based on a separate article or designated advertisement concerning the plaintiff with respect to his conduct as a Municipal Judge.   The first cause of action recites the substance of an editorial in the Toledo Times, one of the newspapers published by Toledo Blade Co., dated November 2, 1961, which, after reciting that the Municipal Court of Toledo is the court where most Toledoans get their impression of "American Jurisprudence" and for that reason " * * * Municipal Court judges above all must possess qualities of tolerance and humane understanding as well as a technical knowledge of the law," further states:

"No one can question Judge William D. Driscoll's fine technical knowledge of the law.   He has a deep passion for constitutional rights and a fierce zeal for defending them.   But unfortunately his regard for the majesty of the law does not appear to have anything to do with human beings.

"It is difficult to imagine how anyone could stir up so

much needless unpleasantness in less than two years than Judge Driscoll has since his appointment to the bench. Over a flimsy technicality he tried to set aside a practice of seven years standing by which some 1,200 to 1,500 Toledoans a month conveniently could pay off minor traffic fines without going to court. On three occasions he imposed Workhouse sentences when none were provided by law. Once he had arrested, booked and fingerprinted a prospective woman juror who, through a misunderstanding, failed to show up for duty—only to excuse her in the end. Another woman juror was ordered brought to the courtroom from her sickbed, on a stretcher. He once insisted that a juror swear under oath that his father, in fact, had just died. And there was that remarkable period during which Judge Driscoll erroneously concluded that the city ordinance covering drunk driving penalties was unconstitutional, and refused to pass on 45 cases until the Supreme Court overruled him.

"In all of this Judge Driscoll's legal motives were of the highest. But his methods of executing them were extreme, brutal and unnecessary. For that reason, the Times recommends that Robert R. Foster be elected to the Municipal Court bench in his place."

This cause of action charges that defendant "intentionally, deliberately, maliciously and with the purpose of defaming the plaintiff published misleading and false statements concerning the plaintiff," referring to the substance of the foregoing editorial. The balance of the allegations of the first cause of action, the plaintiff improperly pleads evidence to explain and justify his conduct with respect to the matters upon which the editorial was based.

The second cause of action is based on a political advertisement dated November 5, 1961, appearing in the Toledo Blade of that date, headed: "The Case of the People Against Judge Driscoll." This advertisement, in part, stated:

"Justice may well have blushed behind her blindfold when Judge William Driscoll mounted the municipal bench.

"For rarely has a man so quickly demonstrated a lack of judicial temperament.

"As The Blade put it in an editorial: 'Right from the start, he pushed aside any pretense of letting compassion or good judgment color his approach to meting out justice, as he sees

it. Ignoring helpful suggestions by veteran court officers, to whom he occasionally delivered an impromptu tongue lashing, Judge Driscoll found himself hoisted by his own petard three times within a month. And in each case, where he had stubbornly proceeded to hand down Workhouse sentences where none was called for by law, he had to back down and vacate them.

### "Complete
### "Unreasonableness

" 'And last week, he provided two more demonstrations of his complete unreasonableness in his treatment of two prospective women jurors. In one instance, he ordered police to haul one woman into court like a common criminal, only to excuse her from jury duty after she reminded him—as he well knew—that she was leaving on vacation. Three days later, in an even more flagrant example of his mulishness, the judge ordered a woman taken from her bed where she had been confined in traction since an auto accident, helped into his august presence in the courtroom, whereupon he finally released her from jury duty.'

"The cases mentioned by The Blade were not the only examples of his high-handed handling of citizens called as jurors. In another case, he insisted that a man take an oath that his father-in-law had passed away the previous day before he would excuse him from jury duty. Death in the family, said Judge Driscoll, was not sufficient reason to be excused from jury duty.

### "Who's Out of Step?

"And, like the Army rookie who insisted everybody else was out of step, Judge Driscoll decided the city ordinance covering drunk driving cases was unconstitutional. It made no difference to him that his four fellow judges did not agree. While they disposed of cases as in the past, he dismissed some and deferred others. When the State Supreme Court finally set him right nearly a year later, there were 45 of his cases to be cleared up."

The petition then states that the statements, and particularly the quotations therein, "are slanted, distorted, over emphasized, misleading, false and defamatory." It is stated that defendant knew that such statements were untrue and pub-

lished in a spirit of cool, calculated malice with intent to grievously harm the plaintiff and to promote their mercenary interests and by such editorial to show that plaintiff was grossly unfit for judicial office and intending to bring plaintiff into hatred, contempt, ridicule and scorn of the general public, impairing his reputation as a lawyer and judge, causing him embarrassment, humiliation and distress of mind, and causing him loss of income.

The third cause of action is based on an advertisement published in the Toledo Blade, Sunday, November 5, 1961. (The election in which the plaintiff was a candidate for election was to be held Tuesday, November 7, 1961.) This cause of action recited that the advertisement was headed: "You be the Judge," and alleges that it was published for the purpose of defaming the plaintiff, and that the statements therein were slanted, distorted, over emphasized, misleading, false and defamatory. The plaintiff restated the claims set forth in his second cause of action as to the effect of such statements on his reputation as a lawyer and judge and the mercenary purpose of the defendant in printing such fictitious scandal and "calumny" regarding a person in a public position of honor and trust.

The advertisement headed "You be the Judge" was published by the "Republican Campaign Committee" in the interests of a candidate opposing the plaintiff for the term for which he was a candidate. In part, it stated:

"The Case

"Judge Imposes Jail Sentences Contrary to Law.

"Judge states death of member of family no reason under law to be excused from jury duty.

"Judge throws traffic court into confusion.

"Seven drunken driving cases dismissed by Judge in running battle with city law department.

"Judge hassles with veteran court officials.

"Judge orders police to haul prospective woman juror into court like common criminal.

"These statements were taken from The Blade's editorial pages and news stories from the period from May 11, 1960, to September 20, 1960, and they accurately reflect some of the arbitrary actions taken by Judge William Driscoll since he was

appointed to the bench in January of 1960 by Governor Disalle.

"He has imposed workhouse sentences on three occasions where none was called for by law. He required a sick juror, an excused juror and a juror with a death in his family to appear before him in open court. He has tried to undo a practical method for handling traffic cases expeditiously, and thrown traffic court into utter confusion.

"These actions have caused the Blade, in an editorial of May 16, 1960, to call him 'temperamental' and to state that 'when justice is dispensed with a hot tongue and cold disregard for human relations, it can easily become injustice.' "

The defendant-appellant claims the following errors:

"1. The verdict and judgment deprive this appellant of its constitutional right to freedom of speech and freedom of the press guaranteed by the First and Fourteenth Amendments of the Constitution of the United States and Section 11 of Article I of the Constitution of Ohio.

"2. The verdict and judgment are contrary to law and the evidence.

"3. The trial court erred in refusing to grant the motion of appellant for judgment in its favor at the conclusion of all the evidence.

"4. The trial court erred in overruling appellant's motion for judgment notwithstanding the verdict.

"5. The trial court erred in overruling appellant's motion for a new trial.

"6. The amount of the verdict is excessive.

"7. The jury, under the influence of passion and prejudice, awarded excessive damages.

"8. The trial court erred in refusing to withdraw a juror and declare a mistrial.

"9. The trial court erred in the admission of improper evidence offered by appellee.

"10. The trial court erred in the rejection of proper evidence offered by appellant.

"11. Appellant was denied the fair and impartial trial guaranteed by the Fourteenth Amendment of the United States Constitution and Section 16 of Article I of the Ohio Constitution.

"12. The trial court erred in giving to the jury, before argument, special instructions requested by the appellee.

"13. The trial court erred in refusing to give to the jury, before argument, special instructions requested by appellant.

"14. The trial court erred in its general instructions to the jury.

"15. The verdict and judgment are not sustained by sufficient evidence and are against the manifest weight of the evidence.

"16. Other errors of law manifest upon the face of the record."

The first five assignments of error concern the question of the limits of the constitutional protection of the press to comment on the conduct of a public official in the discharge of his official duties. Section 11, Article I of the Constitution of Ohio provides:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. In all criminal prosecutions for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury, that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted."

Section 2739.01, Revised Code, defines the necessary allegations in a petition for libel. Section 2739.02, Revised Code, provides that in such an action the defendant may allege and prove the truth of the matter charged as defamatory. The proof of the truth thereof shall be a complete defense. By the provisions of Sections 2739.13 to 2739.15, Revised Code, dealing with the correction of false or misstatement of facts published of one making a demand for a correction, one who makes a demand for a published correction must furnish the publisher with what he claims to be a true statement of the matter in controversy, which must be presented to the publisher under oath.

With the foregoing background of the Ohio Constitution and the statutes dealing with libel, we are presented by the foregoing assignments of error with the question of the constitutional right (Amendments I and XIV, United States Consti-

tution) of the press to comment upon the conduct of the plaintiff in the performance of his public duties and while seeking election to succeed himself to the office to which he was appointed.

The office of Municipal Judge is one of basic importance in the judicial system of Ohio. Fitness of one holding the office of judge of such court or a candidate for election as judge to discharge the duties of such office are matters of public concern and should be open to legitimate public debate to the benefit of and for the public good. Acts and words of a judge committed and stated or announced in the performance of his duties are the subject of fair criticism and report by the public press. Sections 2317.04 and 2317.05, Revised Code, do not deal directly with reporting occurrences in the actual conduct of a trial or proceedings in a trial court, yet the substance of these sections points the way in support of the rule that is now well founded upon case law that a fair report of proceedings in the trial of and the results obtained upon trial in a court may be fairly reported and, when so reported with reasonable accuracy, the report, if publicly made, is privileged. Judicial proceedings are indeed public affairs of the highest order. To safeguard the constitutional rights of the litigants, trials must be held in public (with certain exceptions to protect the public morals) so that a report of what is said or done in open court is then public information, which clearly includes the conduct in act and word of the presiding judge. Everyone in the courtroom attending this case, as reported by the defendant (except for the citations issued for jurors) heard everything that was thereafter the subject of the articles and now complained of as reported in the public press. It is in part, at least, as a result of such reports that the public learns of the basis upon which to consider the question of the qualification of plaintiff and other candidates seeking election to public office.

The state statutes and Constitution, *supra*, and the proceedings in state courts, must be interpreted in the light of the First and Fourteenth Amendments of the United States Constitution and the interpretation of these articles as declared by the Supreme Court of the United States. In the case of *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A. L. R. 2d 1412, Sullivan, an elected official of

Montgomery, Alabama, recovered a judgment against the "Times" for libel based on the fact that the newspaper had published a paid advertisement in which some of the statements contained therein were claimed by respondent to refer to him charging misconduct in the performance of the duties of his office and that such charges were false and untrue and libelous per se. In the syllabus, the Supreme Court concluded:

"*Held*: A state cannot under the First and Fourteenth Amendments award damages to a public official for defamatory falsehood relating to his official conduct unless he proves 'actual malice'—that the statement was made with knowledge of its falsity or with reckless disregard of whether it was true or false."

The court said on page 256:

"We are required in this case to determine for the first time the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a public official against critics of his official conduct."

The court proceeded to say that this case must be considered against "the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," and "That erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive.'"

The court quoted Judge Edgerton, speaking for a unanimous court, in *Sweeney* v. *Patterson*, 76 U. S. App. D. C. 23, 24, as follows:

"'Cases which impose liability for erroneous reports of the political conduct of officials reflect the obsolete doctrine that the governed must not criticize their governors. * * * The interest of the public here outweighs the interest of appellant or any other individual. The protection of the public requires not merely discussion, but information. Political conduct and views which some respectable people approve, and others condemn, are constantly imputed to Congressmen. Errors of fact, particularly in regard to a man's mental states and processes,

are inevitable. * * * Whatever is added to the field of libel is taken from the field of free debate.' "

The United States Supreme Court then said:

"Injury to official reputation affords no more warrant for repressing speech that would otherwise be free than does factual error. Where judicial officers are involved, this Court has held that concern for the dignity and reputation of the courts does not justify the punishment as criminal contempt of criticism of the judge or his decision. *Bridges* v. *California*, 314 U. S. 252. This is true even though the utterance contains 'half-truths' and 'misinformation.' *Pennekamp* v. *Florida*, 328 U. S. 331, 342, 343, n. 5, 345. Such repression can be justified, if at all, only by a clear and present danger of the obstruction of justice. See also *Craig* v. *Harney*, 331 U. S. 367; *Wood* v. *Georgia*, 370 U. S. 375. If judges are to be treated as 'men of fortitude, able to thrive in a hardy climate,' *Craig* v. *Harney, supra*, 331 U. S., at 367, surely the same must be true of other government officials, such as elected city commissioners. Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations."

In reversing the judgment for the respondent primarily for the reason that "the proof presented to show actual malice lacks the convincing clarity which the constitutional standards demands, and hence that it would not constitutionally sustain the judgment for respondent under the proper rule of law," the court cited the case of *Coleman* v. *MacLennan*, 78 Kans. 711, 98 P. 281. In that case the state Attorney General, a candidate for re-election and a member of the commission charged with the management and control of the state school fund, sued a newspaper publisher for alleged libel in an article purporting to state facts relating to his official conduct in connection with a school fund transaction. The defendant pleaded privilege and the trial judge, overruling plaintiff's objection, instructed the jury that:

"Where an article is published and circulated among voters for the sole purpose of giving what the defendant believes to be truthful information concerning a candidate for public office and for the purpose of enabling such voters to cast their ballot

more intelligently, and the whole thing is done in good faith and without malice, the article is privileged, although the principle matters contained in the article may be untrue in fact and derogatory to the character of the plaintiff; and in such a case the burden is on the plaintiff to show actual malice in the publication of the article.''

The court then quotes the Kansas Supreme Court (78 Kans. at 724) in its affirmance of the judgment for the defendant, as follows:

'' 'It is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussion is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. The public benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged.' ''

In the case of *Garrison* v. *Louisiana*, — U. S. —, 13 L. Ed. 2d 125, 85 S. Ct. 209, the defendant was convicted of criminal defamation. He, as District Attorney, during a dispute with the Judges of Criminal District Court of the Parish of New Orleans in holding a press conference, issued a statement to the effect that the large backlog of pending criminal cases was attributed to the inefficiency, laziness and excessive vacations of the Judges and charged them with refusing to authorize disbursements for undercover investigations of vice in New Orleans. According to the opinion, he stated:

"The judges have now made it eloquently clear where their sympathies lie in regard to aggressive vice investigation by refusing to authorize use of the DA's funds to pay for the cost of closing down the Canal Street clip joints. * * *
'' * * *

"This raises interesting questions about the racketeer influences on our eight vacation-minded judges.''

The Supreme Court reversed the judgment of the state court.

The sixth and eighth paragraphs of the S. Ct. Reporter headnotes provide as follows:

"6. Even where the utterance is false, the great principles of Constitution which secure freedom of expression in area of criticism of official conduct of public official preclude attaching adverse consequences to any except the knowing or reckless falsehood; debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth."

"8. Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned; only those false statements made with high degree of awareness of their probable falsity may be the subject of either civil or criminal sanctions."

From the foregoing case law, the following conclusions are apparent:

1. Libel is "that which is written or printed and published calculated to injure the character or reputation of another by bringing him into ridicule, hatred or contempt." Black's Law Dictionary.

2. The person charged with libel by another can have complete exoneration by proving the truth of the matters charged as defamatory. Section 2739.02, Revised Code.

3. Statements by public officials, including judicial officers, as a necessary part of their official duties, including material statements of parties to a judicial proceeding, are privileged. *Liles* v. *Gaster*, 42 Ohio St. 631, *Erie County Ins. Co.* v. *Crecelius*, 122 Ohio St. 210, *Bigelow* v. *Brumley*, 138 Ohio St. 574.

4. Criticism of public officials and their conduct in office is privileged under the First Amendment to the Constitution of the United State unless such publication was made with actual malice, that is, with knowledge that the published matter was false or was published with a reckless disregard of whether it was false or not.

It remains to be determined by an examination of the evidence whether the plaintiff has, in fact, made out a prima facie case against the defendant under the rules of law as just stated.

The statement in the editorial of Thursday, November 2, 1961, concerning the importance of the Municipal Court in the administration of justice in this state cannot be too strongly stressed. Even though its jurisdiction is limited and in the field of criminal law confined to the trial of misdemeanors and ordinance violations, yet more people are directly affected by the cases tried in that court than in any other court in the judicial system of Ohio. There is no such thing as an unimportant case where the legal rights of the people are the subject of judicial inquiry and where a party in many cases must represent or defend himself for reasons much too evident to require explanation. The judge has the burden of seeking the truth and seeing that justice is done in a great many cases with reasonable dispatch, particularly in traffic matters, without the assistance of contending lawyers.

The Municipal Court of the city of Toledo, recognizing that in disposing of traffic citations because of the great number of violations ticketed by police of what might be called "minor cases" where the imposition of sanctions would probably be small, and for that reason uniform, passed by resolution of the judges a rule (similar rules are followed in all large cities in Ohio) permitting one who has received a "ticket" to pay the fine for the stated violation as fixed by the resolution. The method by which the rule was to be carried out was to require the arresting officer to file an affidavit charging the violation on his return to the Safety Building from his tour of duty and to require the defendant, if he desired not to attend court but rather to plead guilty to the charge, to sign the following "Appearance, Plea and Waiver" which was as follows:

"I, the undersigned, do hereby enter my appearance in the Municipal Court of Toledo, Ohio, on the complaint for the offense charged on the reverse side of this notice, and having been informed of my right to a trial and the meaning of the Plea of Guilty and Waiver of Trial, do hereby PLEAD GUILTY to said offense as charged, waive my right to a trial by jury, and a hearing before said court, and agree to pay penalty prescribed by Statute, Ordinance or Court Order."

Judge Driscoll, according to his own testimony, at first refused to sign the docket on which these cases and the fines col-

lected were listed for entry of judgment, thus putting into confusion a practice that had been followed by all the judges since April 21, 1952. The plaintiff testified, in explaining his view of the third item of the advertisement set out in the third count:

"Judge throws Traffic court into Confusion"

"Q. Why wouldn't you sign the docket on cases you didn't know anything about? A. Because frankly I didn't want to be put in an embarrassing position, which I knew could have been done to me so easily and I was frightened and I wasn't going to be put in a position that anybody would believe what I would say about a situation that might very well develop.

"* * *

"Q. I want you to just take a little time here and tell the ladies and gentlemen of this jury about this practice of the Judges signing cases that they knew nothing about.

"* * *

"A. Well, some years ago, I think it was in April of 1952, the judges of the court at that time and various officials, the police, I believe, and I believe the Law Director and possibly some others were a party to a letter or an agreement, a compromise so to speak, and as a consequence of that compromise, the court, the judges, or at least a majority of them, if not all of them, instructed the clerk to take payouts in certain rather ordinary traffic—

"Q. Better explain that word payout, what is that? A. That's what it was known by. By that, these various cases in these various instances one who was cited might take his citation to the clerk, there an affidavit would be on file, he would enter his appearance as before the court, enter a plea of not guilty as before the court and he would accept the sentence which the clerk would pronounce, pursuant to that letter.

"Q. You mean the clerk would pronounce sentence then he would plead not guilty? A. It was a chart so to speak for various moving violations.

"Q. What I am interested in—could they plead not guilty before the clerk? A. That was my question, that's one of the questions. At least that's the way it was handled. And then the following morning these cases would appear on the docket.

"Q. You mean the clerk would give them a sentence? A.

After he would collect the fine. It was just a fine, was a penalty, wasn't a jail sentence.

"Q. And those cases that the clerk had imposed a fine pursuant to his judicial function, they would then appear on a judge's docket the next day? A. That is right."

The foregoing testimony of the plaintiff, which shows that he was completely in error as to the "payout" system under the court order of 1952, the plaintiff's exhibit (Traffic Ticket) showing that in the "payout" the violator entered a plea of guilty, not a plea of not guilty, and that the clerk did not have and did not exercise judicial powers under this rule, and did not render a judgment on receiving the waiver and accepting the scheduled fine. From the plaintiff's own testimony, he was indeed guilty of creating confusion with regard to the disposal of minor traffic cases in a legal way to the benefit of everybody concerned. The newspaper comments in the editorial and the advertisements were truthful in describing the plaintiff's conduct as to "payouts" and what was said or published constituted a fair comment on an important phase of the appellee's conduct as a Municipal Judge. It should be noted that the editorial which was the subject of the first cause of action also made reference to the plaintiff's actions on "payouts." Payouts are clearly justified under Sections 2938.12 and 2945.12, Revised Code.

With the subject of confusion said to have been created by the conduct of the plaintiff as a traffic judge, in addition to payouts, must also be considered his conduct, as shown by his testimony, in the trial of cases where a defendant was charged with driving while under the influence of intoxicating liquor. These cases, as filed by the prosecutor, were based on the ordinance of the city of Toledo dealing with that subject. This ordinance, insofar as the penalty was concerned, was different from that provided for under state law. Section 4511.99, Revised Code. The state law provides that where a jail sentence is imposed the trial court could not suspend and must enforce three days of such jail sentence. No such limitation is found in the penalty provision of the ordinance. It was the holding of the plaintiff that such difference in penalty made the ordinance unconstitutional, and for that reason seven cases were dismis-

sed and the trials of many others were delayed for over a year until the Supreme Court of Ohio passed on the question in the case of *City of Toledo* v. *Best,* 172 Ohio St. 371, where, when decided, the Supreme Court overruled this plaintiff's contention. The other Municipal Judges were in complete accord with each other and in direct disagreement with plaintiff in holding the ordinance unconstitutional. A trial court has the obligation of following the decisions of the reviewing courts on questions of law pertinent to a case in the process of trial. The identical question, that is, whether a difference in penalty between an ordinance of a city and that of a state law dealing with the same subject is unconstitutional, was decided by the Supreme Court of Ohio in the case of *Village of Struthers* v. *Sokol,* 108 Ohio St. 263, and also in the case of *City of Dayton* v. *Miller,* 154 Ohio St. 500, which latter case was followed in the *Best case.* There was no legal reason that could possibly justify the position of the plaintiff in handling prosecutions for driving while intoxicated, which, under the circumstances, cause confusion and was a proper subject to report in the public press.

An examination of the editorial and the advertisements shows that comment was made therein on the fact that the plaintiff announced jail sentences after trial or a plea of guilty on several traffic violators where such penalty was not provided by the ordinance defining the violation charged. When the mistake was called to the plaintiff's attention, and after some argument, he crossed out such entries on his trial docket and substituted a sentence coming within the provisions of the ordinance defining the violation charged. Several pages of plaintiff's trial docket are in evidence. They show the imposition of the jail sentences where the ordinance under which the charge was made, as shown by the affidavit of the arresting officer, did not provide such penalty. Certainly a traffic judge must have before him the affidavit conferring jurisdiction upon the court in a particular case and upon which the case must be tried and is charged with knowledge of the penalty that can be imposed. Such fact must be clearly within his knowledge where jail term is announced upon the imposition of sentence where the ordinance provides for only a fine and costs. Such conduct may be the subject of fair comment by the press where the basis of such comment is, in fact, true. Certainly such comment, un-

der the circumstances, could not be the subject of a libel action.

The editorial and advertisements commenting on the action of the plaintiff in dealing with three citizens who had been called for jury duty to serve in cases then to be tried by the plaintiff will now be considered.

In one case the juror requested that he be excused because of serious illness which resulted in the death of the juror's father-in-law within a day of the time the request was made. The plaintiff refused the first request because it was said to be not a legitimate ground for avoiding jury service. Even after the juror's father-in-law had died, the juror's request to be excused was refused although the court was informed of his death, and not until the court read the death notice in the paper and the juror compelled to testify under oath to the fact of his father-in-law's death was the juror excused.

The circumstances regarding a lady juror who had been called for service and taken into custody on a citation issued by the plaintiff are that she claimed to have been excused from service by the plaintiff upon her request and claimed to have given him the summons. After she heard the police were looking for her, she voluntarily appeared with her lawyer and was put under a $50 bond to insure her appearance the next day (there is no legal provision for such a bond) and, because the citation was not properly withdrawn, was confined in jail until she could be fingerprinted. This humiliation unnecessarily imposed upon her resulted from the failure of the plaintiff to withdraw the citation.

In the remaining incident, the juror called had been in an automobile accident and was at the time here related at home in bed under traction as ordered by her physician. Her physician had written the court of her disability to serve as a juror. The summons was served for duty on the fourth of May 1961. The jurors who reported for duty on that day were ordered to return for duty on May 10th. This juror, not then being present, knew nothing of the change of time for service and, not appearing, the judge issued a citation for her to be brought before the court. The bailiff, however, did not serve the citation but went to her home in his automobile and helped her into court where she was compelled to take the witness stand and under oath testify as to her condition. The printed story on this incident

states that she was brought into court on a stretcher. This statement was not in accord with the facts but came about because the juror called her lawyer about the telephone call from the bailiff and his reply to her was not to go to court "unless they send for you in an ambulance and take you into court on a stretcher." This error, on the facts, is unimportant. She also displayed a copy of her physician's letter to the court clerk stating that she could not serve as a juror. She was then excused from jury duty. The plaintiff testified that this prospective juror signed his nominating petition following the foregoing incident. Her testimony on that subject is as follows as introduced by the plaintiff:

"Q. I see. By the way did you subsequently to that sign his petition for re-election?

"* * *

"A. A party came out to my place of employment and asked me to sign his petition because Mr. Driscoll didn't want me to be disturbed with him. It seems as if there was some reason as to why they was trying to follow me because—

"* * *

"A. I signed the petition."

This was unquestionably done for campaign purposes.

Some claim is made by the plaintiff that the defendant failed to publish a retraction of some of the matters contained in the various news stories published of and concerning the plaintiff, which stories ultimately became the basis of the editorial of November 2, 1961, and the two advertisements which are the background of plaintiff's three causes of action. Plaintiff's letter asking for "a retraction of the misrepresentation and publish the corrections before greater misunderstanding occur" was mailed to the defendant on November 2nd. The substance of the letter preceding the conclusion which is here quoted consists of a denial that he ever ordered a woman juror brought into court on a stretcher; that he had ever had a prospective juror fingerprinted; or that he had ever imposed workhouse sentences contrary to law.

The letter, a plaintiff's exhibit, shows that the plaintiff failed to comply with Section 2739.13 to 2739.16, inclusive, of the Revised Code, by setting forth, in a statement in proper language, "the truth pertaining to such statement" which state-

ment must be on the oath of the person making the demand. For plaintiff's failure to comply with statutory requirements in making such demand, the defendant was under no legal duty to publish plaintiff's request.

Coming now to the remaining assignments of error, we find that assignments of error numbers six and seven (that the judgment is excessive due to passion and prejudice) are well taken and, therefore, sustain such claims. As to assignment of error number eight, while there is substance in the record that would have justified acting favorably on a motion to withdraw a juror and reassign the case for a new trial, yet due to the final order of this court, this assignment of error is overruled. This is equally true of assignments of error numbers nine, ten and eleven, dealing with the admission and rejection of evidence and denying defendant a fair trial. These assignments of error are, therefore, overruled. Assignment of error number twelve deals with plaintiff's request for special instructions before argument. Request No. one was clearly erroneous. Such charge was improper under the *Times* and *Garrison cases* as is true of requested instructions Nos. three and six. Instruction No. seven was incorrect on the subject of burden of proof and was inapplicable under the facts of this case. Also, it confined the jury's consideration to the plaintiff's evidence and was, therefore, prejudicially erroneous. Request No. nine assumes that the plaintiff had been damaged. Such an instruction is improper on the facts that are the basis of plaintiff's claim. Instruction No. eleven deals with express malice. If what was intended was clearly stated, it might be a proper definition of express malice. This instruction is inartfully drawn but probably not prejudicial except as it is considered with other requests clearly erroneous. The evidence in this case does not support assignment of error number twelve. *Richard* v. *Hunter*, 151 Ohio St. 185. Of the special requests presented by the defendant (fourteen in number), only four were given. Certainly defendant's request to charge number one, dealing with the failure to retract statements appearing in its publications, under the evidence in this case, should have been given. Requested instruction No. six, dealing with the degree of proof necessary to establish actual malice where the statement was a proper subject of comment, except for actual malice, is constitutionally

privileged and a proper statement of the law. Its refusal constituted prejudicial error. As stated above, the plaintiff's instruction on this subject, as given, was an incorrect statement of the law.

The remaining requests of the defendant for instructions before argument were, in the main, correct statements of the law dealing with issues presented in this case, but coming to the conclusion that the judgment must be reversed and final judgment entered for the defendant, we need not deal further with them.

In the court's general charge, in addition to errors defining the burden of proof and the degree of proof required to determine actual malice where the defendant claims that what was published was privileged under the First Amendment of the Constitution of the United States (the *Times* and *Garrison cases, supra*), the court erroneously submitted the question of whether the editorial and advertisements were libelous per se and the claim of privilege to the jury where there was no dispute about the facts published. In *Mauk* v. *Brundage*, 68 Ohio St. 89, the second paragraph of the syllabus reads as follows:

"In an action for libel the question whether the publication is or not libelous *per se* is a question for the court. And where the publication is claimed to be privileged the question whether or not the occasion gives the privilege, the controlling facts being conceded, is also for the court."

See, also, *Williams* v. *P. W. Publishing Co.*, 76 Ohio Law Abs. 404.

We hold that the judgment is not sustained by the evidence under the law of *New York Times Co.* v. *Sullivan*, 376 U. S. 254.

A careful study of the record and the publications complained of by the plaintiff shows that the substance of these articles under no circumstances constitutes libel per se. There is no suggestion in the evidence that the defendant acted maliciously to defame the plaintiff. The things that were said of him were substantially true, and his acts in respect thereto were the subject of fair comment on the conduct of a public officer seeking election to a public office to which he had been appointed. Section 2739.02, Revised Code.

The judgment is reversed and final judgment entered for the defendant.

*Judgment reversed.*

Silbert, C. J., and Corrigan, J., concur.

Silbert, C. J., Skeel and Corrigan, JJ., of the Eighth Appellate District, sitting by designation in the Sixth Appellate District.