CONESE, Appellant and Cross–Appellee,

v.

NICHOLS et al., Appellees; Timmer, Appellee and Cross–Appellant.

[Cite as *Conese v. Nichols* (1998), 131 Ohio App.3d 308.]

Court of Appeals of Ohio,
First District,
Hamilton County.

Nos. C–970208, C–970446.

Decided March 13, 1998.

Jacobs, Kleinman, Seibel & McNally and Mark J. Byrne, for appellant and cross–appellee.

James W. Hengelbrok, for appellee and cross–appellant.

Frost & Jacobs, L.L.P., Richard M. Goehler and Jill Meyer Vollman, for appellees Dennis Nichols and the Hamilton Journal–News.

Law Offices of Timothy R. Ruttle and Samuel G. Casolari, for appellee John Crothers.

Dinsmore & Shohl, L.L.P., James A. Comodeca, Matthew V. Brammer and Jeffrey R. Schaefer, for appellees David Green and Mary Ann Willis Sanders.

Millikin & Fitton Law Firm and James S. Irwin, for appellee Ray Nichting.

Hamilton Law Department and Hillary G. Miller, for appellee Gary Roberts.

MARIANNA BROWN BETTMAN, Judge.

APPEAL NO. C–970228

PROCEDURAL POSTURE

Plaintiff-appellant Michael Conese, formerly a judge of the Hamilton Municipal Court, filed a defamation action after he was defeated in the 1995 election. The suit was based on statements made during the course of the 1995 election campaign or immediately thereafter. In this case, Conese sued the Hamilton Journal–News and reporter Dennis Nichols; Ray Nichting and Mary Ann Willis Sanders, co-chairs of the campaign of Conese's opponent, John Rosmarin, now the incumbent municipal judge; Hamilton Fraternal Order of Police President Gary Roberts and his attorney David Green; John Crothers, President of the Fairfield Fraternal Order of Police; William Steven Timmer, President of the Hamilton Professional Firefighters Association; and Dan Crank, a Hamilton City Council member. All statements claimed by Conese to be defamatory were published in the Hamilton Journal–News except those of Nichting and Sanders,

which appeared in Rosmarin's campaign literature. The trial court granted summary judgment to all defendants. Conese has appealed from all judgments except as to Crank.[1] We affirm.

## LEGAL ANALYSIS

The core cases we find dispositive. of all the defamation claims are *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686; *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 72 O.O.2d 134, 331 N.E.2d 713; and *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609. All three turn on the doctrine of qualified privilege, which we shall review. Appellees Timmer, Crothers, Sanders, Nichols, and the Hamilton Journal–News also rely on *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182, to support their positions. Because we find *Vail* inapplicable to these claims, we will address this case briefly only.

## QUALIFIED PRIVILEGE

### A.  Federal Constitutional Analysis

Under federal First Amendment jurisprudence, a qualified privilege[2] attaches to criticism of official conduct. The public policy supporting this rule has never been more eloquently set forth than by Justice Brennan in *New York Times v. Sullivan:*

" '[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions.' " (Citation omitted.)  *New York Times* at 269, 84 S.Ct. at 720, 11 L.Ed.2d at 700.

"Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701.

" '[I]t is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages.' " *Id.* at 281, 84 S.Ct. at 726, 11 L.Ed.2d at 707, quoting *Coleman v. MacLennan* (1908), 78 Kan. 711, 724, 98 P. 281, 286.

---

1.  Conese actually filed a notice of appeal from the summary judgment entered in favor of Crank, but has not pursued that appeal.

2.  A qualified privilege, unlike an absolute privilege, can be defeated.

■ The protected right to criticize includes and covers invective, hyperbole, and unpleasant epithets. See *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789; *Garrison v. Louisiana* (1964), 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125; *Driscoll v. Block* (1965), 3 Ohio App.2d 351, 32 O.O.2d 506, 210 N.E.2d 899. In short, *New York Times v. Sullivan* and all the cases that have followed it emphatically underscore the fact that in the public arena, where there are competing policy considerations of free speech and protection of reputation, the right to criticize public officials and official conduct is going to prevail over hurt feelings. See, *e.g., Garrison* at 72–73, 85 S.Ct. at 215, 13 L.Ed.2d at 131–132.

■ In order for a public official to successfully prosecute a defamation suit relating to his official conduct, he must prove with convincing clarity that the statements were made with actual malice, meaning not just that the statements were false, but also that they were made with knowledge of their falsity or with reckless disregard for whether they were false. *New York Times,* 376 U.S. at 279, 84 S.Ct. at 725, 11 L.Ed.2d at 706. An elected judge in the state of Ohio, in this case former Judge Conese, is unarguably (and apparently this is the single point on which all parties in this case agree) a public official.

Thus, under federal analysis, the privilege to criticize official conduct can only be defeated by proof of actual malice, and the burden of establishing actual malice is on the public official claiming to be defamed.

## B. State Law

■ In addition to the privilege to criticize official conduct clearly articulated under federal law, there are also some important protections arising from state law.

In *Hahn v. Kotten, supra,* the Ohio Supreme Court recognized the qualified-privilege defense to a defamation action. A qualified privilege attaches where the publication is made in a reasonable manner and for a proper purpose. Implicit in this defense is a right and a duty to speak, on matters of concern to a particular interested audience (which could be the general public), and good faith in the publication. In the *Hahn* case, the court held that such a privilege attached to a letter from an insurance company to some of its policyholders informing them of the reasons why it was terminating agent Hahn. This privilege was cited with approval in *Jacobs v. Frank,* holding that the privilege protected a letter written by a physician to an out-of-state medical licensing board about the fitness of another physician to practice medicine. In sum, the *Jacobs* court held:

"The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement

limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *Id.,* 60 Ohio St.3d at 114, 573 N.E.2d at 612.

This privilege was extended once more in *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 651 N.E.2d 1283, to those providing information to government officials about the qualifications of those bidding on public contracts. Again, the underpinning for the protection is speaking for a proper purpose, to proper parties, and in good faith.

The type of qualified privilege described in *Hahn, Jacobs,* and *A & B–Abell* can be defeated only by a clear and convincing showing that the communication was made with actual malice, meaning with knowledge that the statements were false, or with reckless disregard thereof. *Jacobs,* paragraph two of the syllabus. The burden of showing knowledge of falsity or reckless disregard in such cases is on the plaintiff. *Varanese v. Gall* (1988), 35 Ohio St.3d 78, 518 N.E.2d 1177. Further, as clearly articulated by Justice Douglas in *Varanese,* the focus of this determination is not on the defendant's attitude toward the plaintiff, "but rather on the defendant's attitude *toward the truth or falsity* of the statement alleged to be defamatory." (Emphasis *sic.*) *Id.* at 80, 518 N.E.2d at 1180.

## ABSOLUTE PRIVILEGE

In Ohio, "expressions of opinion are generally protected under Section 11, Article I of the Ohio Constitution as a valid exercise of freedom of the press." *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 280, 649 N.E.2d 182, 184, affirming *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699. This is a greater protection than that which is provided under the federal Constitution. *Vail* and *Scott* set out the test to determine whether specific speech is fact or opinion. As noted by Justice Douglas in his concurrence in *Vail,* and a point often missed in defamation cases, "[o]nce a determination is made that specific speech is 'opinion,' the inquiry is at an end. It is constitutionally protected." *Vail* at 284, 649 N.E.2d at 186–187. Thus, the privilege to express opinions articulated in *Vail* and in *Scott* is an absolute privilege.

Thus far, the Ohio Supreme Court has extended this absolute privilege to express opinions only to media defendants (ancillary to "freedom of the press"), and only to statements made directly by, not to, the media, such as the columns in *Vail* and *Scott,* the columns and editorials in *Kilcoyne v. Plain Dealer Publishing Co.* (May 16, 1996), Cuyahoga App. Nos. 68648 and 69345, unreported, and the political cartoon in *Celebrezze v. Dayton Newspapers, Inc.* (1988), 41 Ohio App.3d 343, 535 N.E.2d 755. This absolute privilege has not yet been extended

to all statements of opinion, by anyone, or to the media for the republication of the opinion of others. Thus, we believe that *Vail* has no application in this case.

With this discussion of the law as a backdrop, we now turn to the claims of the parties.

## CLAIMS AGAINST THE PRESIDENT OF THE FAIRFIELD F.O.P. AND THE HAMILTON FIREFIGHTERS' UNION

We first consider Conese's claims against John Crothers, President of the Fairfield Fraternal Order of Police, and William Steven Timmer, head of the Hamilton Firefighters Union, because the analysis of these two claims is the same and the most expeditiously undertaken.

### A. Crothers's Statements

At the same time that Conese was campaigning for re-election to the Hamilton Municipal Court, his twin brother Mark was a candidate for the Fairfield Municipal Court. Both candidates had sought and obtained the endorsement of F.O.P. Lodge 164 in Oxford, Ohio. Mark Conese ran a campaign advertisement in the Journal–News which said, "Endorsed by Police, F.O.P. # 164." Crothers, whose Fairfield F.O.P. Lodge 166 endorsed Mark Conese's opponent, apparently believed that Mark Conese's ad did not clearly distinguish which F.O.P. Lodge endorsed Mark. To clarify his position, Crothers made the following statement about the Conese brothers in a Journal–News story written by Dennis Nichols:

"I don't want their stupid brand of cronyism sitting on the bench in Fairfield. It's a good thing for them they're both judges, because they couldn't make a living as lawyers."

### B. Timmer's Statements

Timmer is President of the Hamilton Professional Firefighters Association Local 20, which voted to endorse Conese's opponent in the election. Timmer then appeared before the Butler–Warren–Clinton Counties Central Labor Council, a federation of local unions, to explain the position of his local union and to urge the council to endorse Conese's opponent. The labor council, in what was apparently a very heated meeting not run according to strict protocol, voted to endorse Conese. The following statement from Timmer appeared in a Journal–News article the next day, under the by-line of Dennis Nichols:

"I've been involved in state and national meetings, and I've never seen one with as much violations of the rules of order. It was kind of like a Conese court."

The statements made by Timmer and Crothers fall classically into the privilege to criticize public officials and their conduct in office, and as such, they are

qualifiedly privileged under the standard of *New York Times v. Sullivan.* As stated by the court in *Driscoll, supra:*

"Criticism of public officials and their conduct in office is privileged under the First Amendment to the Constitution of the United States unless such publication was made with actual malice, that is, with knowledge that the published matter was false or published with a reckless disregard of whether it was false or not." *Driscoll,* 3 Ohio App.2d at 362, 32 O.O.2d at 513, 210 N.E.2d at 906.

The endorsement of political candidates by groups such as the F.O.P. and the Professional Firefighters Association is taken very seriously by members, and endorsement meetings can be hurly-burly affairs. The comments made in this case were nothing more than hyperbole, sarcasm, and invective, which public officials are obliged to bear with a tin ear. The only allegation Conese brought forth in his deposition in response to these defendants' motion for summary judgment was to contend that the statements were false. This is not enough, because false statements alone will not make a case of defamation such as this. The speaker must know they are false or exhibit reckless disregard for their truth. To put it simply, Conese failed in his burden as to statements made by Timmer and Crothers, and summary judgment was properly granted by the trial court to these defendants.

## CLAIMS AGAINST NICHTING AND SANDERS

Nichting and Sanders were co-chairs for Conese's opponent in the 1995 election campaign. The statements Conese alleged were defamatory were contained in a June 1995 letter signed by Nichting and Sanders, and appear in the following paragraph:

"The court's arrogant attitude of 'I am the Judge and do what I say with no questions asked' is unacceptable. People must feel they can use the Court without intimidation by a Judge. This must and will change."

Conese was particularly critical of the use of quotation marks in this paragraph, arguing it gave the false impression that he was being directly quoted. He also criticized other parts of the letter as containing false facts.

The holdings of *New York Times, Hahn,* and *Jacobs* come into play here. The letter was written to a particular audience—those supporting or whose support was being sought for Conese's opponent—and for an appropriate purpose—to urge voters to vote for Rosmarin rather than for Conese. As such, it was qualifiedly privileged. While the quotation marks should not have been used in the letter, they were not misleading. It is obvious from a reading of the entire letter, in the context of urging a vote for Rosmarin, that the remark was not a direct quote from Conese, but merely the impression that Conese apparently

gave to others while on the bench. Thus, we consider the quotation marks in this context to be *prosopopeia*, a form of campaign literary license. What was in the quotation marks was really the impression others had of Conese in the view of Rosmarin's supporters; it was used as a description, not as a quotation.[3]

Once again, Conese had the burden of proving actual malice, and again he simply failed to meet his burden. Thus, summary judgment was properly granted to Nichting and Sanders.

## CLAIM AGAINST PRESIDENT OF HAMILTON FRATERNAL ORDER OF POLICE

At the time this suit was filed, Gary Roberts was the president of Hamilton F.O.P. Lodge 38. During a work session of the Hamilton City Council, Roberts made the following statements, which were reprinted in the Journal–News in a story carrying the by-line of Dennis Nichols:

"[T]he court had a prior incident in which fine money was stolen, an embezzler identified and no criminal charge filed. * * * [T]he court has hired convicted criminals for bailiff or probation officer positions. * * * [T]he court has made the check and related records unavailable even to attorney Michael Shanks, the acting judge October 19 when the incident came to court."

First, we disagree with the argument made on behalf of Roberts that his statements were absolutely privileged because they were made during a local legislative hearing. In Ohio, state senators and state representatives are provided with an absolute privilege by Section 12, Article II of the Ohio Constitution, for statements made in session. In *Costanzo v. Gaul* (1980), 62 Ohio St.2d 106, 16 O.O.3d 134, 403 N.E.2d 979, the Supreme Court extended this rule of absolute privilege to "utterances made during the course of official proceedings *by members of local governing bodies,* at least where the statements relate to a matter under consideration, discussion or debate." (Emphasis added.) *Id.* at 110, 16 O.O.3d at 136, 403 N.E.2d at 983. We are not prepared today, in this case, to extend this absolute privilege to everyone who speaks before a local governing body.

We do, however, believe Roberts's statements fall squarely within the qualified privilege in *Hahn* and *Jacobs.* Roberts attended the council meeting to represent the interests of the Hamilton F.O.P. Lodge 38. His statements were

---

**3.** Judicial campaign conduct, a subject entirely separate from defamation, is governed by Canon 7 of the Code of Judicial Conduct. The accountability of a judge or judicial candidate for the content of campaign materials is clearly set forth in this canon. There is also a process to address accusations of false statements. We venture no opinion in this case about the literature of either candidate in this regard.

clearly made in a reasonable manner, for a proper purpose, on a proper occasion, and to an appropriate audience. At least one of the members of council was seeking a probe of the operations of the Hamilton Municipal Court. Roberts's remarks were part of a work session on this topic. The police shared the building with the court at the time and had their own concerns about court personnel, practices, and security. Roberts's remarks were based on his perception of his duty to speak. Thus we hold that his remarks were qualifiedly privileged.

Once again, Conese failed to meet his burden to defeat this qualified privilege. From the material presented, it is readily apparent that Roberts and Conese did not care for each other. But, as Justice Douglas wrote in *Varanese*, it is not Roberts's attitude toward Conese, but rather Roberts's attitude toward the truth or falsity of the statements alleged to be defamatory that controls. *Varanese* at paragraph one of the syllabus. The United States Supreme Court has stated that "[d]ebate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." *Garrison,* 379 U.S. at 73, 85 S.Ct. at 215, 13 L.Ed.2d at 132.

Conese failed to prove that Roberts knew that the statements he made were false, that Roberts was reckless in regard thereof, or that he in any way exceeded the qualified privilege of *Hahn* and *Jacobs*. Therefore, summary judgment was properly granted below to Roberts.

## STATEMENTS OF ATTORNEY DAVID GREEN

Some additional background is necessary to understand the allegations against David Green in this case. Green is Gary Roberts's attorney. The statements that Conese alleged were defamatory were Green's comments about a defamation lawsuit he had filed against Conese on behalf of Roberts.[4]

On October 26, 1995, shortly before the election, Conese held a press conference at which he stated that a search warrant had been issued to search Roberts's personal residence for drugs and laundered money derived from gambling. There was in fact a 1991 search warrant on file with the county clerk referring to income tax documents, but no warrant for drugs or money. As a result, Roberts filed a defamation suit against Conese and his campaign manager

---

4. The conduct of lawyers, both in regard to trial publicity and statements concerning judges, are governed by the Ohio Code of Professional Responsibility. We express no opinion about Green's statements in this context.

Rex Richardson. Green was quoted in the Journal–News, in a story under Nichols's by-line, as follows:

"The behavior displayed in this case is 100 percent unbelievable. Not only were the allegations against Gary Roberts untrue, but when confronted with the evidence, both defendants (Conese and Richardson) admitted that they were untrue."

Green's deposition established that his client, Gary Roberts, was in Nichols's office at the Journal–News, with Nichols's speakerphone on, while Richardson called to complain about the lack of press coverage for Conese. During this conversation, Richardson admitted to Nichols that neither he nor Conese had seen the search warrant for Roberts's house, which Conese had referred to in his press conference. Roberts conveyed this information to Green. Nichols confirmed this.

As Roberts's long-time lawyer, Green actually had a copy of the search warrant for tax papers and knew there was no other investigation. Although Green did not talk to Conese before he made his remarks in the press, Green had been told of Richardson's admission before he spoke. Richardson was clearly acting as Conese's agent when he admitted that neither one had seen the "drug and money" search warrant. Thus, Green was not reckless in regard to what he said about his client's defamation suit, and Conese's claim again failed. The comment that "the behavior was 100% unbelievable" was not defamatory and thus needs no further analysis.

## THE HAMILTON JOURNAL–NEWS AND
## REPORTER DENNIS NICHOLS

In 1995 Dennis Nichols was the Journal–News reporter covering Hamilton city government. The allegedly defamatory statements of Crothers, Timmons, Roberts, and Green appeared in Journal–News stories under Nichols's by-line. It is Conese's position that the Journal–News and Nichols are liable for defamation for the republication of the defamatory remarks of others. As we discussed earlier, *Vail* affords an absolute privilege to the media for its own opinions. Unlike *Vail*, this case involves no opinions of the Journal–News itself; only the statements of others are involved here.

We agree with the Journal–News that the easiest and cleanest way to resolve this claim would be to hold that the statements were protected under the neutral-reportage doctrine. This is a privilege that protects accurate reporting of accusations which might be defamatory, but which are newsworthy and concern a matter of legitimate public interest. In other words, the message and the messenger are separated in analyzing the defamatory nature of the statements.

Despite the fact that this case presents an excellent example of an appropriate application of the neutral-reportage doctrine—the court and its judges are certainly a matter of public concern—because the Supreme Court of Ohio declined as recently as 1996 to adopt this doctrine,[5] we instead apply the test of *New York Times v. Sullivan* to the claims against the Journal–News and Nichols.

Once again, the burden was on Conese to prove that the newspaper and its reporter published the stories with knowledge of their falsity or with reckless disregard for their truth. Mere failure to investigate the accuracy of a news story cannot, without more, establish liability. *St. Amant v. Thompson* (1968), 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262; *Varanese*, 35 Ohio St.3d at 84, 518 N.E.2d at 1183. In *New York Times*, although what was at issue was an advertisement, the court held that *no* checking at all did not rise to the level of reckless conduct because of the justifiable reliance on the reputation of the sponsors of the ad. In the words of *St. Amant*, "[r]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant* at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267. In this case, Conese presented no evidence of actual malice, and therefore, summary judgment was appropriately entered in favor of the Journal–News and Nichols.

## APPEAL NO. C–970446

### TIMMER'S APPEAL ON DENIAL OF SANCTIONS

In a separate, consolidated appeal, Steven Timmer appeals from the trial court's denial of his motion, brought pursuant to R.C. 2323.51, for sanctions against Conese and his counsel for the filing of a frivolous lawsuit.[6] "Frivolous conduct" is defined in the statute as conduct that either "obviously serves merely to harass or maliciously injure another party to the civil action" or "is not warranted under existing law and cannot be supported by a good faith argument for an extension, modification, or reversal of existing law." R.C. 2323.51(A)(2)(a) and (b).

As discussed previously, Timmer was sued based upon the following comment: "I've been involved in state and national meetings, and I've never seen one with as much violations of the rules of order. It was kind of like a Conese court."

---

5. *Young v. Morning Journal* (1996), 76 Ohio St.3d 627, 669 N.E.2d 1136.

6. The only parties to this appeal are Timmer (appellant) and Conese (appellee).

Before denying Timmer's motion, the court held a hearing, although a transcript of this hearing has not been made a part of the record on appeal. The hearing apparently consisted solely of the arguments of counsel.

A denial of attorney fees as a sanction will not be reversed absent an abuse of discretion. *Riley v. Langer* (1994), 95 Ohio App.3d 151, 642 N.E.2d 1. Timmer's motion raises a close question in this case. However, ultimately, we agree with the observation in *Ceol v. Zion Indus., Inc.* (1992), 81 Ohio App.3d 286, 292, 610 N.E.2d 1076, 1079, that because the trial court had the benefit of observing the entire course of the proceedings and was most familiar with the parties and counsel, the court's finding on the issue of frivolous conduct is entitled to substantial deference on review. Thus, we decline to disturb the trial court's denial of Timmer's motion for sanctions in this matter. Accordingly, this assignment of error is overruled.

The judgments of the court of common pleas are affirmed.

*Judgments affirmed.*

SUNDERMANN, P.J., and SHANNON, J., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.