[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 111.]

**WAMPLER, APPELLANT, *v*. HIGGINS, APPELLEE.**

**[Cite as *Wampler v. Higgins*, 2001-Ohio-1293.]**

*Defamation—Ohio Constitution's separate and independent protection of opinions is not limited in its application to the allegedly defamatory statements made by media defendants—Nonmedia defendant whose allegedly defamatory statements appear in a letter to the editor may invoke the same protection–Section 11, Article I, Ohio Constitution, applied.*

(No. 00-1273—Submitted April 4, 2001 at the Lawrence County Session—Decided August 29, 2001.)

APPEAL from the Court of Appeals for Pickaway County, No. 2000 CA 5.

————————————

**SYLLABUS OF THE COURT**

The Ohio Constitution's separate and independent protection for opinions, recognized in *Scott v. News-Herald* and reaffirmed in *Vail v. Plain Dealer Publishing Co.,* is not limited in its application to the allegedly defamatory statements made by media defendants. A nonmedia defendant whose allegedly defamatory statements appear in a letter to the editor may invoke the same protection, which may or may not apply depending on the totality of the circumstances. (Section 11, Article I, Ohio Constitution, applied; *Scott v. News-Herald* [1986], 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699, and *Vail v. Plain Dealer Publishing Co.* [1995], 72 Ohio St.3d 279, 649 N.E.2d 182, explained and followed.)

————————————

**COOK, J.**

**{¶ 1}** In *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 21, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1, 19, the United States Supreme Court rejected the notion that "an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment" to the United States Constitution. This court later decided, however, that "[r]egardless of the outcome in *Milkovich*, * * * [t]he Ohio Constitution provides a separate and independent guarantee of protection for opinion ancillary to freedom of the press." *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 281, 649 N.E.2d 182, 185.

**{¶ 2}** Now we are asked to determine whether the Ohio Constitution's separate and independent protection for opinions protects only those statements uttered by media defendants, such as the newspaper and columnist in *Vail*, or whether a private citizen unaffiliated with the media, such as the appellee here, may invoke the same independent constitutional protection. We agree with the court of appeals that nonmedia defendants may invoke the Ohio Constitution's independent protection for opinions and affirm its judgment.

### I. Background

**{¶ 3}** On September 25, 1998, the Circleville Herald published a news article entitled "Cardinal Market to close doors." According to the article, Linda McKee, the owner of Linda's Cardinal Market, a downtown grocery, had decided to liquidate the business due to declining sales, "a general degeneration in the downtown area, a proliferation of mini marts around town, and changing customer habits." The article also stated that McKee had been unable to come to terms on a new lease with the owner of the building in which the market was located, appellant Isaac Wampler. McKee stated that she would be unable to afford additional rent that Wampler was seeking under the terms of a proposed new lease. The article quoted Wampler as saying, "I did not want [McKee] to leave," and "I deeply regret

that she has made a decision to leave. My commitment was to her. She has been a part of the community for 16 years."

**{¶ 4}** Three days later, the Circleville Herald published a letter to the editor signed by appellee, Wallace Higgins. The letter stated:

"Dear Editor:

"Downtown Circleville is about to suffer a serious loss. Linda's Cardinal Market, at the corner of Scioto and West Main streets, is being forced out of business by the exorbitant rent now being demanded by the present owner of the building. Most of us who live in the downtown area have depended on Linda and her predecessors, who have been in the grocery business on that site for the past 50 years.

"Ward Skinner and Linda have run a friendly and accommodating store. They knew, understood, and sympathized with their customers. Now, because of one man's self-centered greed, all of that is going to end.

"Too many downtown properties belong to people who care nothing for Circleville and who have no vision for the future. Circleville is a unique place, and everyone could profit from that uniqueness. Instead, some are trying to make it conform to the world for their own profit. They are willing to sell out to some faceless national corporation with no motive but profit and no interest in our history, our architecture, or our tradition. They cheerfully take the money and run and 'let the public be damned!'

"The owner of the Cardinal Market building sold his own Watt Street property, for an astronomical figure, to a mindless corporation. Once he had a taste of the blood of easy money, he has apparently become a ruthless speculator. He would, I'm sure, sell the whole town to heartless corporations so that they might turn it into one great, ugly, sprawling shopping mall. It is pathetic that the whole town must suffer because of the greed of a few uncaring people."

**{¶ 5}** Wampler sued Higgins for defamation in the Common Pleas Court of Pickaway County, alleging that Higgins had falsely stated in his letter that Wampler had forced McKee out of business by charging exorbitant rent. Wampler also claimed that Higgins had impugned his personal and professional integrity and reputation by, among other things, falsely describing Wampler as a "ruthless speculator." According to Wampler, Higgins either knew that his statements were untrue or negligently failed to make a reasonable inquiry into the truth of the statements. Wampler asserted that as a result of Higgins's statements, he had suffered injury to his reputation and business, humiliation, stress, and other unspecified pecuniary and nonpecuniary losses.

**{¶ 6}** In his answer, Higgins admitted that he was the author of the allegedly defamatory letter, but asserted that every statement contained therein "was an honest and good faith expression of opinion." Higgins later made the same contention in a motion for summary judgment. The trial court granted Higgins's motion for summary judgment and dismissed Wampler's complaint.

**{¶ 7}** In its decision and entry granting Higgins's motion for summary judgment, the trial court cited this court's decision in *Vail* for the proposition that "expressions of opinion are generally protected under Section 11, Article I of the Ohio Constitution as a valid exercise of freedom of the press," quoting 72 Ohio St.3d at 280, 649 N.E.2d at 184. The trial court noted that "the Ohio Supreme Court has extended this absolute privilege for opinion only to media defendants (ancillary to 'freedom of the press'), and only to statements made directly by, not to, the media." Despite Higgins's status as a nonmedia defendant, however, the trial court decided that it would determine whether the statements contained in Higgins's letter to the editor were opinions under the four-part test adopted by this court in *Scott v. News-Herald* (1986), 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699, and reaffirmed in *Vail*. Applying this test, the trial court concluded that under the totality of the circumstances, "the language used by defendant in his letter would

4

be understood by the ordinary reader for just what it is—one person's frustration with the perceived plight of many small downtown areas due to small business closures and large corporate takeovers. * * * [T]he average reader would believe that statements contained in defendant's letter are the opinions of the writer and not facts."

{¶ 8} Wampler appealed the trial court's decision to the Pickaway County Court of Appeals. In his first assignment of error, Wampler claimed that the trial court erred when it applied the *Scott/Vail* test to determine whether Higgins's statements were constitutionally protected opinions. Wampler argued that the Ohio Constitution's separate and independent protection for opinions applies only to those allegedly defamatory statements made by media defendants. In his second assignment of error, Wampler contended that the trial court should have concluded that the statements contained in Higgins's letter were actionable statements of fact under the *Scott/Vail* test—not merely expressions of Higgins's opinions. The court of appeals, however, affirmed the trial court's decision granting summary judgment in Higgins's favor.

{¶ 9} Wampler moved the court of appeals to certify a conflict between its decision and that rendered by the First District Court of Appeals in *Conese v. Nichols* (1998), 131 Ohio App.3d 308, 722 N.E.2d 541. As Wampler noted, the *Conese* court had determined that *Vail*'s "absolute privilege to [express opinions had] not yet been extended to all statements of opinion, by anyone, or to the media for the republication of the opinion of others." *Id*. at 315-316, 722 N.E.2d at 546. The Pickaway County Court of Appeals denied Wampler's motion for certification, however, concluding that the *Conese* court's decision did not ultimately turn upon any distinction between media and nonmedia defendants and that any apparent conflict arose from *obiter dicta*.

{¶ 10} Wampler appealed to this court, and the cause is now before us upon the allowance of a discretionary appeal. *Wampler v. Higgins* (2000), 90 Ohio St.3d 1430, 736 N.E.2d 26.

## II. *Vail*'s Guarantee of Protection for Opinions

{¶ 11} To place the instant dispute in its proper context, we begin our analysis by briefly examining the historical development of what we described in *Vail* as Ohio's "separate and independent guarantee of protection for opinion ancillary to freedom of the press." *Id.,* 72 Ohio St.3d at 281, 649 N.E.2d at 185.

{¶ 12} In 1964, the United States Supreme Court decided that the First Amendment to the United States Constitution restricts state defamation law, holding that a public official may not recover damages for a defamatory falsehood concerning his or her official conduct unless he or she proves "actual malice," *i.e.*, that the statement was made with knowledge that it was false or with reckless disregard of whether it was false. *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 279-280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706.

{¶ 13} The United States Supreme Court later decided that the First Amendment does *not* impose the same strict limitations on the states in suits by private persons alleging defamation on matters of public interest. See *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789. The *Gertz* court determined that some degree of constitutional protection nevertheless applies, holding that (1) states may not permit liability to attach in such cases without requiring *some* showing of fault, and (2) states may not permit recovery of presumed or punitive damages without a showing of the *New York Times* brand of malice. *Id*. at 347-350, 94 S.Ct. at 3010-3012, 41 L.Ed.2d at 809-811. The *Gertz* court also stated, "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Id.*, 418 U.S. at 339-340, 94

6

S.Ct. at 3007, 41 L.Ed.2d at 805.  This passage from *Gertz* eventually became "the opening salvo in all arguments for protection from defamation actions on the ground of opinion."  *Cianci v. New Times Publishing Co.* (C.A.2, 1980), 639 F.2d 54, 61.

{¶ 14} In *Ollman v. Evans* (C.A.D.C.1984), 750 F.2d 970, the United States Court of Appeals, District of Columbia Circuit, discussed in detail the import of this brief passage from *Gertz*: "The statement is clearly *dicta*. * * * Despite its status as *dicta*, a majority of federal circuit courts, including this one, have accepted the statement as controlling law." (Emphasis *sic.*)  *Id*. at 974, fn. 6.  "By this statement, *Gertz* elevated to constitutional principle the distinction between fact and opinion, which at common law had formed the basis of the doctrine of fair comment.  *Gertz*'s implicit command thus *imposes upon both state and federal courts the duty as a matter of constitutional adjudication to distinguish facts from opinions in order to provide opinions with the requisite, absolute First Amendment protection*." (Emphasis added; footnote omitted.)  *Id*. at 975.

{¶ 15} Having decided that *Gertz* imposed this constitutional requirement on courts, the *Ollman* court adopted a four-part test[1] designed to assist judges in distinguishing, under the totality of the circumstances, actionable statements of fact from nonactionable statements of opinion.  *Id*. at 979-984.  The United States Supreme Court declined to review *Ollman*, over then Justice Rehnquist's vigorous dissent.  See *Ollman v. Evans* (1985), 471 U.S. 1127, 1129, 105 S.Ct. 2662, 2664, 86 L.Ed.2d 278, 280 (Rehnquist, J., dissenting from the denial of certiorari, argued that the lower courts were erroneously relying on the *Gertz* dicta to "solve with a meat axe a very subtle and difficult question").

{¶ 16} Soon after the United States Supreme Court declined to review *Ollman*, this court, expressly relying on the *Gertz* dicta, adopted *Ollman*'s four-part

---

1. For a detailed discussion of the four-part *Ollman* test, see Part IV below.

test for distinguishing actionable factual statements from nonactionable opinions. *Scott*, 25 Ohio St.3d at 245, 25 OBR at 303, 496 N.E.2d at 701 (quoting the *Gertz* dicta); see, also, *id*. at 250, 25 OBR at 308, 496 N.E.2d at 705-706 (citing *Ollman*, 750 F.2d at 979, and adopting *Ollman*'s four-part test). In *Scott*, a school superintendent alleged that a column published on the sports pages of the News-Herald had falsely accused him of committing perjury at a hearing conducted by the Ohio High School Athletic Association. This court decided, however, that the trial court had correctly granted summary judgment in favor of the newspaper because, under the totality of the circumstances, the article was "an opinion, protected by Section 11, Article I of the Ohio Constitution as a proper exercise of freedom of the press." *Id*. at 244, 25 OBR at 303, 496 N.E.2d at 701.

{¶ 17} Four years after *Scott*, the United States Supreme Court explained that lower courts had misinterpreted the passage from *Gertz* that had formed the basis for the *Ollman/Scott* test. *Milkovich*, 497 U.S. at 18, 110 S.Ct. at 2705, 111 L.Ed.2d at 17. In *Milkovich*, seven justices agreed that "we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.' * * * Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of 'opinion' may often imply an assertion of objective fact." *Id.*

{¶ 18} The *Milkovich* court thus squarely rejected the notion that "in every defamation case the First Amendment mandates an inquiry into whether a statement is 'opinion' or 'fact.' " *Id.* at 19, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. As the court noted, the common law already incorporated a speech-protective privilege of "fair comment" as an affirmative defense to an action for defamation. *Id.* at 13, 110 S.Ct. at 2703, 111 L.Ed.2d at 14. The privilege of fair comment " 'afford[ed] legal immunity *for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of*

8

*fact*.' " (Emphasis added.) *Id.*, quoting 1 Harper & James, Law of Torts (1956) 456, Section 5.28. Given this, and the other "established safeguards" already recognized under the First Amendment, the United States Supreme Court expressly declined to recognize "still another * * * protection for defamatory statements which are categorized as 'opinion' as opposed to 'fact.' " *Milkovich*, 497 U.S. at 17, 110 S.Ct. at 2705, 111 L.Ed.2d at 17. The court determined that the "breathing space" essential for the survival of free expression was "adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'opinion' and 'fact.' " *Id.* at 19, 110 S.Ct. at 2706, 111 L.Ed.2d at 18.

{¶ 19} Though the *Milkovich* court, in no uncertain terms, determined that the *Ollman/Scott* approach was *not* required to satisfy the dictates of the First Amendment, and that such an approach had, in fact, been predicated upon a misinterpretation of the *Gertz* dicta, this court expressly declined to follow *Milkovich* on independent state law grounds in *Vail*, 72 Ohio St.3d at 281, 649 N.E.2d at 185. In *Vail*, a candidate for political office sued the Plain Dealer and a columnist after an allegedly defamatory article about the candidate appeared in the newspaper's Forum section. The article, entitled "Gay-basher takes refuge in the closet," stated that Vail "doesn't like gay people" and that she "added gay-bashing to the repertoire of right-wing, neo-numbskull tactics she is employing * * * in her increasingly distasteful campaign." Other statements in the article accused Vail of engaging in "anti-homosexual diatribe," and stated, among other things, that "Vail wouldn't be the first candidate to latch onto homophobia as a ticket to Columbus." The trial court dismissed Vail's complaint on the basis that the averred defamatory statements were constitutionally protected opinions. The court of appeals reversed, and Vail's appeal provided our court with the opportunity "to revisit our decision in *Scott*" and assess the continuing validity of the fact/opinion dichotomy we had adopted in that case. *Vail*, 72 Ohio St.3d at 280, 649 N.E.2d at 184.

**{¶ 20}** In *Vail*, we expressly conceded that, in the interval since *Scott*, the United States Supreme Court had decided that " 'opinion' is afforded no additional protection under the United States Constitution." *Id.* at 281, 649 N.E.2d at 185, citing *Milkovich*, 497 U.S. at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19. Even so, we determined that "[r]egardless of the outcome in *Milkovich*, the law in this state is that embodied in *Scott*. The Ohio Constitution provides a separate and independent guarantee of protection for opinion ancillary to freedom of the press." *Id*. Though we downplayed the significance of our divergence from the United States Supreme Court in *Vail*, suggesting that "it may be considered a distinction without a difference," we also expressly noted that "it does alter the method of analysis. The focus shifts to whether the language under question is to be categorized as fact or opinion." *Id.* at 281-282, 649 N.E.2d at 185.

**{¶ 21}** After applying the *Ollman/Scott* test in *Vail*, we decided that the trial court had correctly dismissed the plaintiff's action for failure to state a claim under Civ.R. 12(B)(6), as "the ordinary reader would accept this column as opinion and not as fact. Therefore, the statements are protected under Section 11, Article I of the Ohio Constitution." *Id.,* 72 Ohio St.3d at 283, 649 N.E.2d at 186. *Vail*'s syllabus reaffirms *Scott*'s proposition: "When determining whether speech is protected opinion a court must consider the totality of the circumstances. Specifically, a court should consider: the specific language at issue, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared." *Id*., syllabus, citing *Scott*, 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699. Compare *Ollman,* 750 F.2d at 979-984.

### III. *Wampler v. Higgins*

{¶ 22} The instant dispute centers on the continuing validity, scope, and proper application of this court's decision in *Vail*. Both of the lower courts concluded that Higgins was entitled to summary judgment under the four-part *Scott/Vail* test because the allegedly defamatory statements contained in his letter to the editor were—as a matter of law—nonactionable expressions of Higgins's opinions. Wampler raises three interrelated arguments in support of reversal. First, he urges us to revisit *Vail* and "adopt the approach set forth in the Supreme Court's *Milkovich* decision." In the alternative, Wampler urges us to refrain from extending *Vail*'s rule to cases such as this, in which the defendant is a private citizen unaffiliated with the media. Finally, he contends that "[i]f the four-part test described in *Scott* and *Vail* does apply to this case, it was applied incorrectly by the courts below." For the following reasons, however, we reject each of Wampler's arguments.

A

{¶ 23} Wampler first urges us to revisit *Vail*, to abandon the *Scott/Vail* test, and to adopt the approach set forth by the United States Supreme Court in *Milkovich*. In support of this argument, Wampler relies on Justice Pfeifer's concurring opinion in *Vail*. As Justice Pfeifer correctly observed in that case, Section 11, Article I of the Ohio Constitution not only guarantees that every citizen of our state may freely speak, write, and publish his or her sentiments on all subjects, it also expressly provides that every citizen is "responsible for the abuse of the right." *Vail*, 72 Ohio St.3d at 285, 649 N.E.2d at 188 (Pfeifer, J., concurring, citing Section 11, Article I, Ohio Constitution). In his merit brief to this court, Wampler refers to this observation in Justice Pfeifer's concurring opinion and asks us to reconsider our decision in *Vail* on the basis that the Ohio Constitution "is not broader than the First Amendment to the United States Constitution. To the

contrary, it appears to be narrower." For the following reasons, however, we disagree.

{¶ 24} The qualifying language in Section 11, Article I to which Wampler refers could indeed be interpreted as militating against this court's recognition of any *additional* speech-protective safeguards under the Ohio Constitution beyond those that are absolutely *required* by the United States Supreme Court's interpretation of the First Amendment. See *Vail*, 72 Ohio St.3d at 286, 649 N.E.2d at 188 (Pfeifer, J., concurring). At least one commentator has suggested that jurisdictions governed by constitutions explicitly recognizing liability for the abuse of free expression should not extend "supraconstitutional" protections to purely private defamations for which there are no binding federal constitutional requirements. See Elder, Defamation: A Lawyer's Guide (1993) 59, Section 8.7. Each constitutional restriction on the tort of defamation is in derogation of the common law, under which "defamatory communications were deemed actionable regardless of whether they were deemed to be statements of fact or opinion." *Milkovich*, 497 U.S. at 12-13, 110 S.Ct. at 2702, 111 L.Ed.2d at 14, citing Restatement of Torts (1938), Sections 558, 565-567.

{¶ 25} In spite of these observations, however, a majority of this court expressly eschewed the *Milkovich* approach in *Vail*. Though the United States Supreme Court determined that still another safeguard for allegedly defamatory speech was unnecessary, *Milkovich,* 497 U.S. at 17, 110 S.Ct. at 2705, 111 L.Ed.2d at 17, this court decided that the Ohio Constitution requires a different analytical focus—a *categorical* determination of whether, under the totality of the circumstances, an ordinary reader of the allegedly defamatory statements would deem them to be statements of fact or opinion.[2] *Vail*, 72 Ohio St.3d at 281, 649 N.E.2d at 185.

---

2. *Vail* is not the only case in which a majority of this court has interpreted language in Article I of the Ohio Constitution differently than the United States Supreme Court has interpreted its federal

**{¶ 26}** The categorical approach that we reaffirmed in *Vail* does not conflict with the explicit constitutional qualification noted by Justice Pfeifer in his concurring opinion—that Ohio's citizens are *responsible for the abuse* of their right to free speech. *Vail*'s "separate and independent guarantee of protection" for opinions will apply to the benefit of a defamation defendant only when his or her allegedly defamatory statements constitute, as a matter of law, statements of opinion under *Scott*'s four-part test. Citizens who abuse their constitutional right to freely express their sentiments by uttering defamatory statements of fact will fail *Scott*'s test and remain liable for the abuse of that right.[3] See, *e.g.*, *McKimm v. Ohio Elections Comm.* (2000), 89 Ohio St.3d 139, 145, 729 N.E.2d 364, 371, fn. 2 (citing the four-part test from *Vail* and *Scott*, and deciding that the average reader of a campaign brochure would view a cartoon contained therein as "a false factual assertion" that the incumbent candidate had accepted cash in exchange for a vote to award a construction contract).

**{¶ 27}** In addition to the foregoing, the principles of *stare decisis* militate against accepting Wampler's invitation to reconsider *Vail's* six-year-old interpretation of Section 11, Article I. As the United States Supreme Court has noted, " 'the doctrine of *stare decisis* is of fundamental importance to the rule of law.' " *Patterson v. McLean Credit Union* (1989), 491 U.S. 164, 172, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132, 147, quoting *Welch v. Texas Dept. of Highways & Pub. Transp.* (1987), 483 U.S. 468, 494, 107 S.Ct. 2941, 2957, 97 L.Ed.2d 389, 410. Like the United States Supreme Court, we recognize that "[o]ur precedents

---

counterpart. In *Humphrey v. Lane* (2000), 89 Ohio St.3d 62, 68, 728 N.E.2d 1039, 1045, this court determined that the Free Exercise Clause contained in Section 7, Article I of the Ohio Constitution was broader than the parallel federal provision, necessitating divergence from the federal test for religiously neutral, evenly applied government actions.

3. Accordingly, Wampler's first proposition of law—"Libelous statements published by a non-media defendant about a private individual are not constitutionally protected under Section 11, Article I of the Ohio Constitution"—may indeed be an accurate statement of the law in those cases where the allegedly libelous statements are statements of fact under the *Scott/Vail* test.

are not sacrosanct, for we have overruled prior decisions where the necessity and propriety of doing so has been established." *Patterson*, 491 U.S. at 172, 109 S.Ct. at 2370, 105 L.Ed.2d at 148. But "any departure from the doctrine of *stare decisis* demands special justification." *Id.,* citing *Arizona v. Rumsey* (1984), 467 U.S. 203, 212, 104 S.Ct. 2305, 2311, 81 L.Ed.2d 164, 172. This is true even in cases of constitutional interpretation—an area in which the United States Supreme Court has determined that the doctrine of *stare decisis* is less compelling. See *Dickerson v. United States* (2000), 530 U.S. 428, 443, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405, 419 (requiring "special justification," even in constitutional cases).

{¶ 28} Wampler has advanced no compelling justification to revisit *Vail* and modify our interpretation of Section 11, Article 1. He claims that the *Scott/Vail* test "creates confusion and ambiguity" in defamation law and has "skewed the balance" between the preservation of free expression and the maintenance of an individual's right to guard his reputation, but he cites only the lower court opinions in this very case as support for this contention. Even if we were to agree with Wampler that the lower courts here misapplied *Vail*'s four-part test—which we do not—we would not abandon *Vail*'s test on that basis alone.

B

{¶ 29} Wampler proposes that should we decide against reconsidering *Vail*, we should at least limit its application to media defendants. In his merit brief, Wampler notes, "To date, this Court has not expressly extended *Vail* and *Scott* to encompass situations in which the defendant is a private figure." See, also, *Conese v. Nichols,* 131 Ohio App.3d at 315-316, 722 N.E.2d at 546. We are not persuaded, however, by Wampler's proposed distinction between media and nonmedia defendants.

{¶ 30} Section 11, Article I is the source of the "separate and independent" protection for opinions that this court recognized in *Scott* and later reaffirmed in *Vail*. See *Scott*, 25 Ohio St.3d at 244, 25 OBR at 303, 496 N.E.2d at 701; *Vail*, 72

14

Ohio St.3d at 281, 649 N.E.2d at 185. It guarantees to "[e]very citizen" the right to publish freely his or her sentiments on all subjects, regardless of that citizen's association or nonassociation with the press. See *Sovchik v. Roberts* (May 9, 2001), Medina App. No. 3090-M, unreported, 2001 WL 490015, *3, fn. 1 ("the plain language of the constitutional provision '[e]very citizen' cannot reasonably be construed as applying only to members of the media. * * * This court must give effect to the words used in the Ohio Constitution, and the term '[e]very citizen,' should mean just that").

{¶ 31} Just as the plain language of Section 11, Article I of the Ohio Constitution fails to support Wampler's proposed distinction between media and nonmedia defendants, our prior cases interpreting that language likewise endorse no such distinction. It is true, as Wampler notes, that in both *Scott* and *Vail*, when this court recognized and reaffirmed the Ohio Constitution's independent protection for opinions, we did so by explicitly referring to the *freedom of the press*. See *Scott*, 25 Ohio St.3d at 244, 25 OBR at 303, 496 N.E.2d at 701 ("We find the article to be an opinion, protected by Section 11, Article I of the Ohio Constitution as a proper exercise of freedom of the press"); *Vail*, 72 Ohio St.3d at 281, 649 N.E.2d at 185 ("The Ohio Constitution provides a separate and independent guarantee of protection for opinion ancillary to freedom of the press"). Wampler contends that because these cases described Ohio's independent protection for opinions with explicit reference to freedom of the press, we should decline to recognize that protection in cases such as the one at bar, in which the defendant is a private citizen unaffiliated with the media. We disagree, however, with Wampler's narrow reading of *Scott* and *Vail*.

{¶ 32} In *Scott* and *Vail*, the plaintiff sued a newspaper and its columnist. Given that each of the defendants in *Scott* and *Vail* was affiliated with the print media, it is not surprising that this court announced its holdings in those cases with reference to freedom of the *press*. In neither case, however, did this court suggest

that Ohio's categorical protection for opinions would *not* be available to nonmedia defendants such as Higgins who, though personally unaffiliated with the media, utilize a media forum to comment on a matter of public concern.[4] See *Sovchik*, 2001 WL 490015, at *3, fn. 1. This court's prior express reference to the press, shaped by the status of the parties appearing before the court in those cases, "implies no endorsement of the principle that speakers other than the press deserve lesser First Amendment protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985), 472 U.S. 749, 783, 105 S.Ct. 2939, 2958, 86 L.Ed.2d 593, 618 (Brennan, J., dissenting).

{¶ 33} Wampler claims that in *McKimm*, we "tacitly acknowledged" that Ohio's *Scott/Vail* test is "unwieldy," and attempted "to bring Ohio closer to the federal test," under which no categorical protection for opinions applies. As noted above, *McKimm* concerned an allegedly defamatory cartoon that had been disseminated as part of a campaign brochure. In that case, we reaffirmed *Vail*'s principle that the freedoms of speech and press are "*independently recognized* by the United States and Ohio Constitutions." (Emphasis added.) *McKimm*, 89 Ohio St.3d at 142, 729 N.E.2d at 369, citing *Vail*. We analogized federal and state defamation law in *McKimm* to underscore the fact that under *both* of these independent systems, when the *meaning* of an allegedly defamatory statement is in question, courts apply an objective "ordinary reader" test to determine whether an

---

4. Indeed, in *Scott*, this court noted that "[e]xpressions of opinion are generally accorded absolute immunity from liability under the First Amendment" without qualification based on the status of the defendant. *Scott*, 25 Ohio St.3d at 250, 25 OBR at 307, 496 N.E.2d at 705, citing, *inter alia, Chaves v. Johnson* (1985), 230 Va. 112, 119, 335 S.E.2d 97, 102. The *Chaves* court had decided that an *architect's* statements about a competitor were nonactionable statements of his opinions—the architect's nonaffiliation with the media notwithstanding. *Chaves*, 230 Va. at 118-119, 335 S.E.2d at 101. *Vail*'s syllabus and opinion similarly contain no status-based distinction concerning defamation defendants, providing simply that "[w]hen determining whether *speech* is protected opinion a court must consider the totality of the circumstances" by applying *Scott*'s test. (Emphasis added.) *Vail*, 72 Ohio St.3d 279, 649 N.E.2d 182, syllabus. The "speech" referred to in *Vail*'s syllabus is not qualified by the status of the defendant who utters it. Accordingly, neither *Scott* nor *Vail* supports the distinction between media and nonmedia defendants that Wampler invites us to adopt here.

allegedly libelous statement is a false statement of fact. *Id*. at 144, 729 N.E.2d at 371. Such an analogy need not be read to imply that the threshold *Scott* test required under the Ohio Constitution is "unwieldy" or unduly speech-protective.[5] *McKimm* actually undermines Wampler's claim that *Scott* and *Vail* "skewed the balance" in favor of defamation defendants, for in *McKimm* we upheld the Ohio Election Commission's decision to reprimand the candidate who disseminated the defamatory cartoon in his campaign brochure. *Id*. at 150, 729 N.E.2d at 375. *McKimm* illustrates that, even after *Vail*'s reaffirmation of *Scott*'s fact/opinion dichotomy, Ohio's citizens remain responsible for the abuse of their constitutional right to freely publish their sentiments.

{¶ 34} Courts in several other states have declined to recognize the sort of distinction between media and nonmedia defendants that Wampler proposes here, and we find their reasoning persuasive.[6] In addition to these courts, the authors of the Restatement of the Law 2d, Torts, have discouraged courts from distinguishing between media and nonmedia defendants for purposes of access to a constitutional

---

5. This court expressly noted in *McKimm* that the objective tests applied under *both* federal and Ohio law prevent publishers of false statements of fact from "escap[ing] liability for their harmful and false assertions simply by advancing a harmless, subjective interpretation of those statements." *Id.* at 145, 729 N.E.2d at 371.

6. See, *e.g.*, *Jacron Sales, Inc. v. Sindorf* (1976), 276 Md. 580, 592, 350 A.2d 688, 695 (Court of Appeals of Maryland stating, "Nor do we discern any persuasive basis for distinguishing media and non-media cases. * * * Issues of public interest may equally be discussed in media and non-media contexts, and the need for a constitutional privilege, therefore, obtains in either case"); *Kotlikoff v. Community News* (1982), 89 N.J. 62, 73, 444 A.2d 1086, 1092 (Supreme Court of New Jersey applying fact/opinion test in suit concerning private citizen's allegedly defamatory letter to the editor, noting that the nonmedia defendant had exercised his right to free speech "in one of the last remaining public forums"); *Culliton v. Mize* (Minn.App.1987), 403 N.W.2d 853, 856 (Court of Appeals of Minnesota deciding that "no distinction should be drawn between media and non-media defendants [because] the first amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech"); *Sall v. Barber* (Colo.App.1989), 782 P.2d 1216 (Colorado Court of Appeals applying fact/opinion test in suit against author of letter to the editor, affirming summary judgment for the nonmedia defendant); *Gilbert v. Bernard* (1995), 4 Mass.L.Rptr. 143, 1995 WL 809550 (Superior Court of Massachusetts declining to impose different fault standards in cases concerning media and nonmedia defendants, noting that "[t]he media is not omniscient; the media's views on the important issues of the day * * * have no inherently greater worth than the views of any other speaker in society").

privilege: "[T]he protection of the First Amendment extends to freedom of speech as well as to freedom of the press, and the interests that must be balanced to obtain a proper accommodation are similar. It would seem strange to hold that the press, composed of professionals and causing much greater damage because of the wider distribution of the communication, can constitutionally be held liable only for negligence, but that a private person, engaged in a casual private conversation with a single person, can be held liable at his peril if the statement turns out to be false, without any regard to his lack of fault." 3 Restatement of the Law 2d, Torts (1977), Section 580B, Comment *e*.

{¶ 35} We recognize that some state courts have declined to extend the same constitutional protections to nonmedia defendants that are available to media defendants. See, *e.g.*, *Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc*. (1983), 143 Vt. 66, 461 A.2d 414, affirmed on other grounds (1985), 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593. In *Dun & Bradstreet*, the Supreme Court of Vermont relied principally on a case from the Supreme Court of Oregon to support its decision distinguishing between media and nonmedia defendants. *Id.* at 74, 461 A.2d at 418, citing *Harley-Davidson Motorsports, Inc. v. Markley* (1977), 279 Ore. 361, 366, 568 P.2d 1359, 1362-1363.

{¶ 36} In *Harley-Davidson Motorsports,* the Supreme Court of Oregon decided that in defamation actions against nonmedia defendants, "[t]he crucial elements * * * which brought the United States Supreme Court into the field of defamation law are missing. There is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press." *Id.,* 279 Ore. at 366, 568 P.2d at 1362-1363. For these reasons, the Supreme Court of Oregon rejected the idea that a private plaintiff's avenue for recovery against a nonmedia defendant "should be made more difficult in situations in which no such constitutional values are involved merely

18

for the sake of securing symmetry of treatment of defendants." *Id.* at 370-371, 568 P.2d at 1365. The Supreme Court of Vermont found the Oregon court's reasoning "persuasive and compelling" in *Dun & Bradstreet*, 143 Vt. at 74, 461 A.2d at 418, but we do not.

{¶ 37} These cases that disfavor nonmedia defendants are unpersuasive for a number of reasons. First, as we have already noted, the language of our state's Constitution requires the "symmetry of treatment of defendants" deemed unnecessary by the Supreme Court of Oregon, for Section 11, Article I independently protects the sentiments uttered by "[e]very citizen" regardless of that citizen's affiliation or nonaffiliation with the media. Moreover, the Supreme Court of Oregon's rationale in *Harley-Davidson*—adopted by the Supreme Court of Vermont in *Dun & Bradstreet*—rests on the stated premise that restricting nonmedia defendants' access to constitutional privileges poses no threat to meaningful debate on public issues, and no threat of self-censorship by the press. *Harley-Davidson*, 279 Ore. at 366, 568 P.2d at 1362-1363. The shortcomings of this premise are particularly evident in cases such as the one at bar, concerning a suit against the author of a letter to the editor published in a local newspaper. Constitutionally significant debate on matters of public concern is not the sole province of the media. See *Gilbert v. Bernard* (Mass.Super.1995), 4 Mass.L.Rptr. 143, 1995 WL 809550. The robust exchange of ideas that occurs each day on the editorial pages of our state's newspapers could indeed suffer if the nonmedia authors of letters to the editor published in these forums were denied the same constitutional protections enjoyed by the editors themselves. Accord *Jacron Sales, Inc. v. Sindorf* (1976), 276 Md. 580, 350 A.2d 688; *Kotlikoff v. Community News* (1982), 89 N.J. 62, 444 A.2d 1086.

{¶ 38} In addition, the courts that decided both *Harley-Davidson* and *Dun & Bradstreet* later questioned the analysis contained in those cases. As the Supreme Court of Oregon itself later admitted, its opinion in *Harley-Davidson*

rested in part upon an incorrect assessment of the United States Supreme Court's defamation jurisprudence. See *Wheeler v. Green* (1979), 286 Ore. 99, 107, 593 P.2d 777, 783, fn. 5 (conceding that "[i]n *Harley-Davidson* * * * we erroneously stated that all of the United States Supreme Court cases limiting actions for libel under the First Amendment involved media defendants. That was true of the cases cited to us on this issue and discussed in the opinion. There were, however, no media defendants in [those cases]"). Similarly, the Supreme Court of Vermont's decision in *Dun & Bradstreet* was later called into doubt by *Ryan v. Herald Assn. Inc.* (1989), 152 Vt. 275, 279, 566 A.2d 1316, 1319, fn. 1 (conceding that "[t]he United States Supreme Court's rejection of this court's rationale in *Dun & Bradstreet* * * * casts doubt on the vitality of the distinction for constitutional purposes").

{¶ 39} Finally, several members of the United States Supreme Court have agreed that distinguishing between media and nonmedia defendants for purposes of access to constitutional protections would be improper. When the United States Supreme Court reviewed Vermont's *Dun & Bradstreet* case, at least five justices agreed in separate opinions that the rights of the media in the context of defamation law are no greater than those enjoyed by other speakers. See *Dun & Bradstreet*, 472 U.S. at 773, 105 S.Ct. at 2952-2953, 86 L.Ed.2d at 611-612 (White, J., concurring); *id.* at 782-783, 105 S.Ct. at 2957-2958, 86 L.Ed.2d at 617-618 (Brennan, J., dissenting). In his concurring opinion, Justice White stated: "Wisely, in my view, Justice Powell does not rest his application of a different rule here on a distinction drawn between media and nonmedia defendants. On that issue, I agree with Justice Brennan that the First Amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech. None of our cases affords such a distinction; to the contrary, the Court has rejected it at every turn. It should be rejected again, particularly in this context, since it makes no sense to give the most protection to those publishers who reach the most

readers and therefore pollute the channels of communication with the most misinformation and do the most damage to private reputation." (Footnote omitted.) *Id*. at 773, 105 S.Ct. at 2952-2953, 86 L.Ed.2d at 611-612.

{¶ 40} Justice Brennan, joined by Justices Marshall, Blackmun, and Stevens, similarly stated: "Relying on the analysis of the Vermont Supreme Court, respondent urged that [we restrict] the applicability of *Gertz* to cases in which the defendant is a 'media' entity. Such a distinction is irreconcilable with the fundamental First Amendment principle that '[t]he inherent worth of * * * speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.' " *Id*. at 781, 105 S.Ct. at 2957, 86 L.Ed.2d at 617 (Brennan, J., dissenting), quoting *First Natl. Bank of Boston v. Bellotti* (1978), 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707, 718.[7] Though we diverged in *Vail* from the United States Supreme Court's defamation jurisprudence in order to reaffirm the existence of the Ohio Constitution's separate and independent protection for opinions, we find persuasive reasoning within the high court's jurisprudence to support our rejection of Wampler's proposed distinction between media and nonmedia defendants.

### IV. Application of the *Ollman/Scott/Vail* Test

{¶ 41} In his second and third propositions of law, Wampler claims that, even if the Ohio Constitution's independent protection for opinion speech may be invoked by nonmedia defendants, the trial court erred when it decided, as a matter of law, that Higgins successfully invoked it in this case. We disagree.

{¶ 42} As the trial court noted, we examine the totality of the circumstances in order to determine whether a published statement constitutes an opinion

---

7. In a later case, *Philadelphia Newspapers, Inc. v. Hepps* (1986), 475 U.S. 767, 780, 106 S.Ct. 1558, 1565, 89 L.Ed.2d 783, 795, Justice Brennan noted that while the majority reserved the question whether the rule it announced applied to nonmedia defendants, he adhered to his previously expressed view that such a distinction would be improper, citing *Dun & Bradstreet,* 472 U.S. at 781, 105 S.Ct. at 2957, 86 L.Ed.2d at 617 (Brennan, J., dissenting).

protected by the Ohio Constitution. "Consideration of the totality of [the] circumstances * * * involves at least four factors. First is the specific language used, second is whether the statement is verifiable, third is the general context of the statement and fourth is the broader context in which the statement appeared." *Scott*, 25 Ohio St.3d at 250, 25 OBR at 308, 496 N.E.2d at 706. "This analysis is not a bright-line test * * *. '[T]he totality of the circumstances test * * * can only be used as a compass to show general direction and not a map to set rigid boundaries.' " *Vail,* 72 Ohio St.3d at 282, 649 N.E.2d at 185, quoting *Scott*, 25 Ohio St.3d at 250, 25 OBR at 308, 496 N.E.2d at 706. See, also, *Ollman*, 750 F.2d 970, 979-984.

{¶ 43} The weight given to any one factor under this inquiry will vary depending on the circumstances of each case. *Vail,* 72 Ohio St.3d at 282, 649 N.E.2d at 185. "While necessarily imperfect, these factors * * * assist in discerning as systematically as possible what constitutes an assertion of fact and what is, in contrast, an expression of opinion." *Ollman*, 750 F.2d at 979. Application of the four-factor test allows courts to assess, with some degree of predictability, the actionability of those statements that fall on the spectrum somewhere between paradigmatic statements of fact (such as "Mr. Jones had ten drinks at his office party and sideswiped two vehicles on his way home") and paradigmatic statements of opinion (such as "Mr. Jones is a despicable politician"). *Id*. at 978.

{¶ 44} In his second proposition of law, Wampler submits that the task of distinguishing between statements of fact and opinion "should remain the province of the jury, subject only to the condition (as in any case) that there must be sufficient evidence to enable a jury to conclude that the challenged statements are false and defamatory." As Judge Starr noted for the court in *Ollman*, however, "the overwhelming weight of post-*Gertz* authority [holds] that the distinction between opinion and fact is a matter of law. Although the Supreme Court has never directly addressed this issue, the Court has clearly ruled that questions as to other privileges

derived from the First Amendment, such as the qualified privilege as to public officials and public figures, are to be decided as matters of law. Moreover, the predictability of decisions, which is of crucial importance in an area of law touching upon First Amendment values, is enhanced when the determination is made according to announced legal standards and when a body of public case law furnishes published examples of the manner in which these standards are to be applied." (Citations omitted.) *Id*. at 978. We agree with the *Ollman* court that the applicability of the *Ollman/Scott/Vail* "opinion privilege" in a given case is a question of law for the court.[8]

**{¶ 45}** The trial court in this case decided, as a matter of law, that the statements contained in Higgins's letter to the editor were expressions of his opinions, as opposed to statements of fact, and granted summary judgment in favor of Higgins on this basis. We review the trial court's decision granting summary

---

8. By referring here to the "*other privileges* derived from the First Amendment" (emphasis added), the *Ollman* court suggests that what it had previously referred to as "protection" for opinions, see *id*. at 975 ("absolute First Amendment protection"), *id.,* 750 F.2d at 975, fn. 7 ("absolute, constitutionally based protection") operates, procedurally, as a *privilege*. See, also, *id*. at 984 (again referring to the "First Amendment's opinion privilege"). Our majority opinion in *Vail* never expressly describes the Ohio Constitution's "separate and independent guarantee of protection for opinion" as a *privilege*, though some appellate courts, including the court below, subsequently described it as such. See, *e.g.*, *Conese*, 131 Ohio App.3d at 315-316, 722 N.E.2d at 546; *Wampler v. Higgins* (May 31, 2000), Pickaway App. No. 2000 CA 5, unreported, 2000 WL 730218, *6; *Sovchik v. Roberts* (May 9, 2001), Medina App. No. 3090-M, unreported, 2001 WL 490015, *3, fn. 1. The term "privilege" commonly encompasses *affirmative defenses* by which a defendant "acknowledges at least part of the conduct complained of but asserts that the defendant's conduct was authorized or sanctioned by law." Black's Law Dictionary (7 Ed. 1999) 1215. In this sense, a privilege operates as a legal justification or excuse for admittedly tortious conduct. *Id*. For the sake of clarity, however, we note that a defendant's attempt to invoke Ohio's "separate and independent guarantee of protection" for opinions may also be proper in the context of a motion to dismiss for failure to state a claim under Civ.R. 12(B)(6), as was the procedural context in *Vail*, 72 Ohio St.3d at 283, 649 N.E.2d at 186 (noting the necessity of construing, under Civ.R. 12[B][6], all inferences in the plaintiff's favor). This approach is justified because one of the elements of a private figure's cause of action in defamation is a false statement, *Davis v. Jacobs* (1998), 126 Ohio App.3d 580, 710 N.E.2d 1185, and a statement deemed to be an opinion as a matter of law cannot be proven false. See *Ollman*, 750 F.2d at 976. And though words that are defamatory *per se* normally carry a presumption of falsity, damages, and malice, this is so "unless published on a privileged occasion." *Becker v. Toulmin* (1956), 165 Ohio St. 549, 557, 60 O.O. 502, 506, 138 N.E.2d 391, 397, citing 53 Corpus Juris Secundum, 43, Libel and Slander, Section 8.

judgment *de novo*, *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243, 1245, citing *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, 245, and apply *Scott*'s test below. We emphasize that, although we have chosen to assess the four *Scott* factors in the order they were enumerated in that case, "[w]e do not * * * suggest that the four-factor analysis is to be undertaken in a rigid lock-step fashion." *Ollman*, 750 F.2d at 980, fn. 17.

## 1. The Specific Language Used

{¶ 46} As Judge Starr noted in *Ollman*, it is often appropriate to begin an assessment of the totality of the circumstances by analyzing "the common usage or meaning of the allegedly defamatory words themselves. We seek in this branch of our analysis to determine whether the allegedly defamatory statement has a precise meaning and thus is likely to give rise to clear factual implications. A classic example of a statement with a well-defined meaning is an accusation of a crime" (footnotes omitted), *Ollman*, 750 F.2d at 979-980, whereas "statements that are 'loosely definable' or 'variously interpretable' cannot in most contexts support an action for defamation." *Id*. at 980. "Readers are * * * considerably less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning." *Id*. at 979.

{¶ 47} In *Scott*, assessing an allegedly defamatory newspaper column concerning a school superintendent's testimony at a hearing, we found that this factor weighed in favor of actionability. *Scott,* 25 Ohio St.3d at 251, 25 OBR at 309, 496 N.E.2d at 707. Though the column contained no express statement that the superintendent committed perjury at the hearing, we concluded that "the clear impact in some nine sentences and a caption [was] that appellant 'lied at the hearing after * * * having given his solemn oath to tell the truth." *Id*. Though we decided in *Scott* that the specific language in the column weighed in favor of actionability, we found this factor outweighed by other factors under the totality of the circumstances. *Id*. at 254, 25 OBR at 311, 496 N.E.2d at 709.

**{¶ 48}** Wampler alleged in his complaint that Higgins's letter to the editor contained two defamatory statements: (1) that Wampler "forced Ms. McKee out of business by charging her an exorbitant rent" and (2) that Wampler was a "ruthless speculator." In Wampler's memorandum in opposition to summary judgment, he specifically discussed additional statements contained in Higgins's letter: (1) that Wampler was possessed of "self-centered greed" and (2) that Wampler sold his property "for an astronomical sum, to a mindless corporation." The trial court assessed all of these statements in its opinion and order granting summary judgment, deciding that "the language used by defendant in his letter would be understood by the ordinary reader for just what it is—one person's frustration with the perceived plight of many small downtown areas due to small business closures and large corporate takeovers. The letter conjures a vast array of highly emotional responses that will vary from reader to reader. None is similar to the typical examples of punishable criminal or disciplinary conduct * * *." (quoting *Vail*, 72 Ohio St.3d at 283, 649 N.E.2d at 186, without attribution).

**{¶ 49}** We agree with the trial court that the specific language employed by Higgins in his letter weighs against actionability. Each of the allegedly defamatory statements at issue here resembles the sort of "loosely definable," "variously interpretable," "indefinite," and "ambiguous" statements discussed in *Ollman*, 750 F.2d at 979-980. Though plainly pejorative in tone, with Higgins describing Wampler as a "ruthless speculator" possessed of "self-centered greed" charging "exorbitant rent," these phrases are all inherently imprecise and subject to myriad subjective interpretations. See *Vail*, 72 Ohio St.3d at 283, 649 N.E.2d at 186 (deciding that a columnist's accusations that a candidate engaged in "anti-homosexual diatribe" and fostered homophobia "can hardly be defined with crystal clarity," and were "value-laden" and "subjective"). Accord *Cole v. Westinghouse Broadcasting Co., Inc.* (1982), 386 Mass. 303, 435 N.E.2d 1021 (Supreme Judicial Court of Massachusetts holding that a statement that a reporter had engaged in

"sloppy and irresponsible reporting" was too imprecise to support a defamation action); *Buckley v. Littell* (C.A.2, 1976), 539 F.2d 882 (holding that an accusation that a columnist was a "fellow traveler" of "fascists" was susceptible of widely different interpretations).

## 2. Verifiability

**{¶ 50}** Under *Scott*'s test, we also assess whether an allegedly defamatory statement is verifiable. *Scott,* 25 Ohio St.3d at 251, 25 OBR at 309, 496 N.E.2d at 707. We seek to determine whether the allegedly defamatory statements are objectively capable of proof or disproof, for "a reader cannot rationally view an unverifiable statement as conveying actual facts." *Ollman*, 750 F.2d at 981. "An obvious potential for quashing or muting First Amendment activity looms large when juries attempt to assess the truth of a statement that admits of no method of verification." *Id*. at 981-982.

**{¶ 51}** In *Scott,* this court decided that this factor, like the first, weighed in favor of the plaintiff, for an accusation of perjury was "an articulation of an objectively verifiable event" that could be proven "with evidence adduced from the transcripts and witnesses present at the hearing." *Scott*, 25 Ohio St.3d at 252, 25 OBR at 309, 496 N.E.2d at 707. Unlike an accusation of perjury, however, which may be subject to proof or disproof upon the application of facts to an accepted legal standard, the allegedly defamatory statements contained in Higgins's letter to the editor are simply not amenable to verification. Had Higgins falsely stated that Wampler sought to double or triple McKee's rent, instead of simply describing Wampler's proposal as "exorbitant," this factor may have weighed more in Wampler's favor. Such a statement, after all, might be verified with reference to McKee's most recent lease agreement, compared with a proposed lease agreement containing a specific price term. But Higgins's description of Wampler's proposed rent as "exorbitant," much like his characterization of Wampler as "ruthless," and his distaste for Wampler's "faceless," "mindless," or "heartless" corporate vendee,

are standardless statements not amenable to objective proof or disproof. See *Vail*, 72 Ohio St.3d at 283, 649 N.E.2d at 186 (finding only the columnist's references to Vail's honesty to be objectively verifiable). Moreover, unlike the defendant in *McKimm*, who indicated to readers that "research documentation" was available in support of the claims made in his campaign brochure, Higgins provided no supporting references in his letter for any of the disparaging remarks he directed at Wampler. See *McKimm*, 89 Ohio St.3d at 140, 729 N.E.2d at 367.

### 3. General Context

**{¶ 52}** *Scott's* totality-of-the-circumstances inquiry also includes two distinct "contextual" assessments. *Scott,* 25 Ohio St.3d at 252, 25 OBR at 309, 496 N.E.2d at 707. One of these is a consideration of the "immediate context" in which the allegedly defamatory statement appears. *Ollman*, 750 F.2d at 983. We examine more than simply the alleged defamatory statements in isolation, because the language surrounding the averred defamatory remarks may place the reasonable reader on notice that what is being read is the opinion of the writer. *Scott* at 252, 25 OBR at 309, 496 N.E.2d at 707. Put another way, as Judge Starr explained in *Ollman*, courts should assess "the entire article or column" because "unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content." *Ollman*, 750 F.2d at 979. In *Ollman*, the court examined an allegedly defamatory column by Rowland Evans and Robert Novak in its entirety. The court decided— with particular emphasis on hypothetical questions contained in the penultimate paragraph—that the columnists "meant to *ventilate* what in their view constituted the central questions" raised by the plaintiff's possible appointment as chair of a faculty department. (Emphasis added.) *Id*. at 987.

**{¶ 53}** Considering Higgins's allegedly defamatory statements in the context of the entire letter, we find that the average reader of the Circleville Herald would be unlikely to infer that those statements were factual. The gist of Higgins's

letter as a whole is that *in his opinion*, Wampler forced McKee out of business by charging her too much rent, and that Wampler should have negotiated a lower lease agreement with McKee instead of "sell[ing] out" to a corporation with no direct link to Circleville's unique history. As in *Ollman*, the letter's concluding paragraphs, in particular, place the reader on notice that Higgins sought to "ventilate" his personal frustrations and opinions concerning the loss of a valued downtown business—not to set forth any verifiable statements of fact. See *Ollman*, 750 F.2d at 987. Higgins's penultimate paragraph is a vague polemic, attacking a hypothetical "some" who "cheerfully take the money and run and 'let the public be damned!' " The final paragraph, though addressed specifically to Wampler, implausibly suggests that Wampler would "sell the whole town to heartless corporations so that they might turn it into one great, ugly, sprawling shopping mall." As in *Scott*, "[w]hile [the defendant's] mind is certainly made up, the average reader viewing the words in their internal context would be hard pressed to accept [his] statements as * * * impartial reporting." *Scott*, 25 Ohio St.3d at 253, 25 OBR at 310-311, 496 N.E.2d at 708.

### 4. Broader Social Context—Genre

{¶ 54} In addition to examining the allegedly defamatory statements as they appear in context, we also examine "the broader social context into which the statement fits. Some *types of writing or speech by custom or convention* signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." (Emphasis added.) *Ollman*, 750 F.2d at 983. This fourth factor focuses, then, not merely on the internal context within which a particular written statement appears, but on the unmistakable influence that certain "well established *genres* of writing will have on the average reader." (Emphasis *sic.*) *Id.* at 984.

{¶ 55} In *Scott*, we noted that the allegedly defamatory column about the wrestling coach "appeared on the sports page—a traditional haven for cajoling, invective, and hyperbole." *Scott*, 25 Ohio St.3d at 253, 25 OBR at 311, 496 N.E.2d

at 708. In both *Vail* and *Ollman*, as here, the allegedly defamatory statements appeared in a forum even more traditionally linked to vigorous expressions of opinion regarding matters of public concern—the newspapers' *opinion* pages. See *Vail*, 72 Ohio St.3d at 282, 649 N.E.2d at 185 (noting that the column appeared on the Forum page of the newspaper, and that the words "forum" and "commentary" "convey a message that the reader of columns so designated will be exposed to the personal opinions of the writer"); *Ollman*, 750 F.2d at 984 ("it is well understood that editorial writers and commentators frequently 'resort to the type of caustic bombast traditionally used in editorial writing to stimulate public reaction,' " quoting *Natl. Rifle Assn. v. Dayton Newspapers, Inc.* [S.D. Ohio 1983], 555 F.Supp. 1299, 1309).

{¶ 56} We agree with the court of appeals that because Higgins's allegedly defamatory statements appeared in a letter to the editor, "a common forum for citizens of the community to express viewpoints on a wide variety of subjects," this fourth factor also weighs in Higgins's favor. Letters to the editor, though at times intemperately worded, are integral to the "robust and uninhibited commentary on public issues that is part of our national heritage." *Kotlikoff*, 89 N.J. at 73, 444 A.2d at 1092. The "vituperative wording" of these letters serves to warn readers that, in contrast to the factual news articles appearing elsewhere in the paper, the letters are part of a "social forum for personal opinion." *Sall v. Barber* (Colo.App.1989), 782 P.2d 1216, 1219. As the Court of Appeals of New York has noted, "[t]he public forum function of letters to the editor is closely related in spirit to the 'marketplace of ideas' * * * that compelled recognition of the privileges of fair comment, fair report and the immunity accorded expression of opinion. These values are best effectuated by according defendant some latitude to publish a letter to the editor on a matter of legitimate public concern * * * free of defamation litigation." *Immuno AG. v. Moor-Jankowski* (1991), 77 N.Y.2d 235, 255, 566 N.Y.S.2d 906, 917, 567 N.E.2d 1270, 1281.

**{¶ 57}** We do not suggest here that publication of defamatory statements in a letter to the editor will insulate the author from liability in every case. See *Scott*, 25 Ohio St.3d at 252-254, 25 OBR at 309-311, 496 N.E.2d at 707-708 ("we are not persuaded that a bright-line rule of labeling a piece of writing 'opinion' can be a dispositive method of avoiding judicial scrutiny"). See, also, Annotation, Defamation: Publication of "Letter to Editor" in Newspaper as Actionable (1980), 99 A.L.R.3d 573, Section 4. We merely note that it is commonly known that the authors of letters to the editor are normally not engaged in the business of factual reporting or news dissemination, and that their letters qualify as what the *Ollman* court described as a "well established *genre*" of opinionated speech. See *Ollman*, 750 F.2d at 984. For these reasons, like the first three factors of the *Scott* test, the fourth factor weighs in Higgins's favor. Under the totality of the circumstances, therefore, we agree with the court of appeals that the allegedly libelous statements contained in Higgins's letter to the editor are, as a matter of law, nonactionable expressions of Higgins's opinion.

## V. Conclusion

**{¶ 58}** For the foregoing reasons, we hold that the Ohio Constitution's separate and independent protection for opinions, recognized in *Scott v. News-Herald* and reaffirmed in *Vail v. Plain Dealer Publishing Co.,* is not limited in its application to allegedly defamatory statements made by media defendants. A nonmedia defendant whose allegedly defamatory statements appear in a letter to the editor may invoke the same protection, which may or may not apply depending on the totality of the circumstances. Because we agree with the court of appeals that Higgins could invoke the *Scott/Vail* test, and that the statements contained in his letter to the editor were, as a matter of law, nonactionable expressions of his opinions, we affirm the court of appeals' judgment.

*Judgment affirmed.*

MOYER, C.J., F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

RESNICK, J., concurs in syllabus and judgment.

DOUGLAS, J., dissents.

PFEIFER, J., dissents.

————————————

**PFEIFER, J., dissenting.**

{¶ 59} Circleville is still a small town, small enough, at least, that anyone who truly cared could quickly learn whether what Higgins wrote about Wampler was true. Also, most people are smart enough to look at who's doing the squawking before they draw any conclusions about the person being squawked about. That's part of the beauty of small-town life.

{¶ 60} But this case has implications beyond the corner of Scioto and West Main. Thus, I dissent and reiterate my statements in *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 285-287, 649 N.E.2d 182, 187-189 (Pfeifer, J., concurring in judgment only), that the Ohio Constitution does not create an additional, separate constitutional privilege for opinion. Instead we should look at whether the statements made are provably false or whether the statements can be reasonably interpreted as stating actual facts about an individual. *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 19-20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1, 18-19. In this case, I believe that there are enough statements within Higgins's hyperbole that either are provable as false or could be interpreted as stating actual facts about Wampler that Wampler should have survived summary judgment.

{¶ 61} In the end, Wampler may have suffered a few dollars worth of damages—or whatever the going rate is for an apology.

————————————

*Cooper & Elliot, Charles H. Cooper, Jr., Rex H. Elliot* and *Aaron D. Epstein,* for appellant.

*McGrath & Breitfeller, L.L.P.,* and *Thomas R. McGrath;* and *James K. Hill*, for appellee.

_____