[Cite as *Byrne v. Univ. Hosps.*, 2011-Ohio-4110.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95971**

## SHELLIE C. BYRNE

PLAINTIFF-APPELLANT

vs.

## UNIVERSITY HOSPITALS, ET AL.

DEFENDANTS-APPELLEES

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-718343

**BEFORE:** S. Gallagher, J., Sweeney, P.J., and Cooney, J.

**RELEASED AND JOURNALIZED:** August 18, 2011

**ATTORNEYS FOR APPELLANT**

Steven A. Sindell
Rachel Sindell
Sindell and Sindell, LLP
23611 Chagrin Boulevard
Suite 227
Beachwood, Ohio   44122


**ATTORNEY FOR APPELLEES**

Barton A. Bixenstine
Vorys, Sater, Seymour and Pease LLP
2100 One Cleveland Center
1375 East Ninth Street
Cleveland, Ohio 44114


SEAN C. GALLAGHER, J.:

{¶ 1}   Appellant Shellie C. Byrne appeals the decision of the trial court granting summary judgment in favor of Memorial Hospital d.b.a. University Hospitals Geneva Medical Center ("Geneva"), University Hospitals Health System, Inc. ("UHHS"), and Tracy Waller (collectively "appellees") upon Byrne's complaint alleging "defamation, tortious interference with prospective business relations, and misrepresentation in a public false light."   For the following reasons, we affirm the decision of the trial court.

**{¶ 2}** Byrne was employed at Geneva as a registered nurse first assistant ("RNFA") from September 2006 through her voluntary resignation in December 2007. She and Mary Lynne Krumins were the only two RNFAs working at Geneva at the time. Byrne initially reported to the perioperative services manager, Leonard Dreslinski, who in turn reported to the director of ambulatory services, Jeff Carlson. Waller started as a staff nurse.

**{¶ 3}** In 2007, a dispute arose between the hospital and the union representing the nurses. In response, Geneva created two new supervisor positions, one each for the operating room ("OR") and outpatient surgery. The parties dispute whether RNFA certification was a prerequisite for the new supervisor positions or just a preference. Regardless, three employees, Byrne, Waller, and Krumins, applied for the two positions. Byrne complains, now and at the time, that Waller should not have even applied for the position because Waller lacked RNFA certification. Byrne also contends that Waller had an improper, though not sexual, relationship with Dreslinski. She argues that Dreslinski improperly attempted to advance Waller into the supervisory position because of this relationship.

**{¶ 4}** In August 2007, Dreslinski transferred to another facility, leaving his position temporarily open. Shortly thereafter, Carlson selected Byrne and Krumins to fill the open supervisor positions. Byrne was selected for the perioperative supervisor of outpatient surgery services position, a position she had not sought nor felt was within her qualifications. Byrne had previously been assigned and successfully functioned as an

RNFA in the OR, which is more aligned with the other supervisor position to which Carlson appointed Krumins. Byrne initially declined her offer, but eventually accepted.

{¶ 5} In September 2007, Waller was offered Dreslinski's old position, for which Byrne admits Waller was qualified. Waller now supervised Byrne and answered to Carlson. Byrne argues that Waller was responsible for the decision to select Byrne for the outpatient supervisor position despite the fact that Carlson said he made the decision and Waller was not in a supervisory position until after Byrne was offered and accepted the position. According to Byrne's testimony, she did not know who made the ultimate decision to select her for the position, but she felt that Waller influenced that decision.

{¶ 6} Byrne expressed displeasure with the new position and, in November 2007, met with Carlson, Waller, and the human resources manager, Kate Van Stratton, to discuss the situation. In December 2007, Byrne voluntarily resigned from the supervisory position and transferred back to a staff nurse position in Geneva's surgery department. Five days later, Byrne voluntarily resigned from Geneva altogether and started a new job outside UHHS.

{¶ 7} Subsequent to the resignation, Waller completed a termination form to finalize Byrne's departure. UHHS used the same termination form to finalize the employment record for all departing employees. Incorporated into that standardized form was a check box asking Waller, as Byrne's immediate supervisor, to indicate whether Waller would recommend rehiring Byrne in the future at any other UHHS facility. Waller checked the box indicating that she would not so recommend after

consulting with Carlson and Van Stratton. Carlson claimed he made the decision to recommend not rehiring Byrne, and he further directed Waller to mark the termination form accordingly. Byrne argues that Waller admitted making the decision unilaterally.

{¶ 8} The no-rehire statement is an isolated statement. There are no reasons given for the recommendation on the form. It is simply a check box indicating that the prior supervisor would not recommend rehiring within UHHS. According to Waller's affidavit, however, the decision was in part based on what Waller considered to be unreasonable actions: Byrne continually complained about her compensation despite having UHHS's policy explained and no error found; Byrne resigned from her supervisory position within two months of accepting it and went back to a staff nurse position without attempting to learn the new required skill-set for the supervisory position; and upon accepting the salaried position, Byrne took more time off, with little advance notice, than when subject to the hourly structure. Byrne does not contest the substance of those statements. She does disagree with the tenor of them and argues that those reasons do not support the conclusion to recommend against any UHHS facility rehiring her. Waller conceded that none of the activities in isolation would cause her to check the no-rehire recommendation box.

{¶ 9} Byrne advanced three claims against the appellees based on the "no-rehire recommendation": defamation, tortious interference with a business relationship, and false light. The trial court granted summary judgment in favor of appellees and against Byrne on all three claims. It is from this decision that Byrne appeals, raising three

assignments of error, which are set forth in the attached appendix. We shall consider them in the order presented in her appellate brief.

{¶ 10} Appellate review of summary judgment is de novo, governed by the standard set forth in Civ.R. 56. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. *Hollins v. Shaffer*, 182 Ohio App.3d 282, 2009-Ohio-2136, 912 N.E.2d 637, ¶ 12. Under Civ.R. 56(C), summary judgment is proper when the moving party establishes that "(1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing *Temple v. Wean United, Inc*. (1977), 50 Ohio St.2d 317, 327, 364 N.E.2d 267. While a party requesting summary judgment bears the initial burden to show the basis of the motion using the evidence allowed under Civ.R. 56(C), once the moving party satisfies this burden of production, the nonmoving party must offer specific facts showing a genuine issue for trial. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293-94, 662 N.E.2d 264.

{¶ 11} In her first assignment of error, Byrne argues that the trial court erred in granting summary judgment upon her defamation claim. Succinctly stated, Byrne argues

that Waller's statement, the no-rehire recommendation on the termination form, constitutes an actionable, defamatory remark as it disparages Byrne's work-related performance. Because we find that Waller's statement is one of opinion, we find no merit to her first assignment of error.

{¶ 12} "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." *Vail v. The Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 280, 649 N.E.2d 182, citing Section 11, Article I, Ohio Constitution. Expressions of opinion are generally protected under Ohio law. Id. at 280. To prevail on her defamation claim, Byrne must show that (1) a false statement of fact was made, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff suffered injury as a proximate result of the publication, and (5) the defendant acted with the required degree of fault in publishing the statement. *Pollock v. Rashid* (1996), 117 Ohio App.3d 361, 368, 690 N.E.2d 903.

{¶ 13} The threshold determination of whether the allegedly defamatory statement is one of fact or opinion is a matter of law to be decided by the court. *Sikora v. Plain Dealer Publishing Co.*, Cuyahoga App. No. 81465, 2003-Ohio-3218, ¶ 16. In making this determination, a court must consider the totality of the circumstances, including (1) the specific language used, (2) the verifiability of the statement, (3) the general context of the statement, and (4) the broader context in which the statement appeared. *Vail*, 72 Ohio St.3d at 282, citing *Scott v. News-Herald* (1986), 25 Ohio St.3d 243, 496 N.E.2d

699. The weight afforded to any one factor varies depending on the specific circumstances of the case. Id. We will address each of the *Scott* factors in turn, combining the third and fourth factors for the sake of simplicity.

{¶ 14} Under the first factor of the *Scott* test, the specific language of the statement, courts must analyze the common usage of the defamatory words and determine whether they have a precise meaning leading to clear factual implications. *Wampler v. Higgins*, 93 Ohio St.3d 111, 127, 2001-Ohio-1293, 752 N.E.2d 962. The more well-defined the statement, the more the statement lends itself to being one of fact. Id. Vague statements subject to varying interpretations weigh in favor of being considered non-actionable opinions. In *Scott,* the court assessed an assertion, made in a letter to a newspaper, that a school employee lied at a hearing. The Ohio Supreme Court found that the first factor weighed in favor of actionability despite the fact the column did not contain an express statement that the defamed committed perjury. *Scott*, 25 Ohio St.2d at 251. The only likely impact of the statement, that the defamed lied at a hearing, was that the defamed committed the crime of perjury. Id. (ultimately deciding that the other factors outweighed first factor and therefore the statement was one of opinion). There was no other reasonable interpretation of the statement.

{¶ 15} In the current case, the alleged defamatory statement is the no-rehire recommendation on the termination form. The "statement" is not one that leads to clear factual implications. This is not like the statement in *Scott*, that someone lied in a hearing, which carries only one obvious implication of perjury. The decision whether to

recommend an ex-employee for future employment within UHHS is open to various interpretations. Different supervisors would have different value criteria for evaluating employees. A recommendation to not rehire is just that, a recommendation based on the subjective opinion of the supervisor. The first *Scott* factor does not weigh in favor of the no-rehire recommendation being considered a statement of fact.

{¶ 16} The second *Scott* factor, verifiability of the statement, tests whether the statement is "objectively capable of proof or disproof." *Wampler*, 93 Ohio St.3d at 129. The issue in *Scott* was relatively straightforward. Saying that someone perjured himself is readily verified through the transcripts of the proceeding and the testimony of the witnesses. In contrast, in *Wampler*, one of the defamatory statements at issue was whether a landlord "exorbitantly" raised rents to throw out the tenant. Id. The court noted that the statement would have been verifiable had the statement been more quantitative in nature. For example, a statement that the rent was doubled or tripled is verifiable. Id. Measure the increase against the original rent, and there is an answer. Using the word "exorbitant" introduces varying interpretations of what is considered "exorbitant." Id.

{¶ 17} Under the facts of the current case, the same rationale from our analysis of the first factor also addresses whether the statement is one that can be verified. It is impossible to verify whether an ex-employee should be rehired. The decision to rehire fully depends on the supervisor's opinion. There is no objective way to prove or disprove this recommendation. While an employee's work history will certainly lend

itself to verifying an employee's intrinsic worth, the no-rehire recommendation still hinges on the particular supervisor's individual value criteria. Byrne has not identified any method for a court to review whether she should have been recommended for rehire at UHHS.

{¶ 18} On this point, Byrne argues that it is the facts underlying the statement that can be verified. In other words, Waller's reasons for the no-rehire recommendation can be verified and, therefore, the reasons behind the decision form the basis for the no-rehire statement being actionable. This argument is not persuasive for multiple reasons.

{¶ 19} Much like the difference between the vague use of "exorbitant" versus some quantitative increase noted in *Wampler*, the mere fact that an opinion rests on facts does not transform opinion into fact. *Wampler*, 93 Ohio St.3d at 129. Byrne's main argument is that the conduct that Waller, Carlson, and Van Stratton relied on was insufficient to conclude against recommending Byrne for future employment at any UHHS facility. In essence, Byrne's opinion differs as to the consequences of her conduct. In her eyes it did not warrant the no-rehire recommendation because UHHS's policies or general employment principles did not prohibit her actions. Waller, Carlson, and Van Stratton disagree. This highlights the subjective nature of the no-rehire statement and further weighs in favor of finding that the statement is one of opinion and not fact.

{¶ 20} Byrne cites to *Davis v. Ross* (C.A.2, 1985), 754 F.2d 80, for the proposition that an employer's no-rehire recommendation is an actionable statement. Aside from the

fact that *Davis* is based on New York state law, in that case, the statement at issue went beyond just an isolated no-rehire recommendation. The ex-employee in *Davis* voluntarily resigned. The defendant, however, stated that when she, the employer, lets an employee go, it is because the employee's "work or their personal habits are not acceptable." Id. at 81-82. Not only did that statement incorrectly present the circumstance of the ex-employee's departure, but it also negatively addressed her work and personal habits. The employer conditioned the no-rehire recommendation on the employee's work habits being unacceptable. Id.

{¶ 21} In the current case, the no-rehire recommendation is not conditioned on anything. It is simply a blanket recommendation against rehiring Byrne at any other UHHS facility. There is no indication of how the termination occurred or for what reasons. Byrne and any reader are left to speculate as to the reasons, and therefore, we find that the no-rehire recommendation is not one that can be readily verified.

{¶ 22} Under the third factor, the general context of the statement, courts look at the immediate context in which the statement appears. Words need to be placed in the proper context. Courts cannot analyze the statement in isolation. The entirety of the language may indicate whether an opinion is being offered even when the statement itself sounds like one of fact. *Wampler*, 93 Ohio St.3d at 130. For example, in *Wampler*, the court found it compelling that the statements came from a letter published in a newspaper, the tenor of which displayed the writer's general frustration at corporate greed. The writer was displeased with the landlord's driving a local commercial tenant out of

business by raising the rents in order to insert a more profitable, faceless, corporate conglomerate. Id. The letter, being one of opinion in general, would tend to put the reader on notice that the author is offering her subjective opinion.

{¶ 23} Finally, under the fourth factor, courts must analyze the broader social context into which the statement fits. Id. at 131. For example, looking back at *Scott* and the defamatory statement about the school employee perjuring himself at a hearing, the article containing the statement "appeared on the sports page — a traditional haven for cajoling, invective, and hyperbole." *Scott,* 25 Ohio St.2d at 253. The court noted that articles appearing in other sections of the paper, such as the front page, could be scrutinized in a different light. Id. Readers are more likely to give credence to purported news stories.

{¶ 24} In addressing both the general and social context within which the statement is made under the facts of the current case, we find the no-rehire statement to be one of opinion. This no-rehire recommendation was made for the limited purpose of informing other UHHS facilities and departments of the last supervisor's opinion of the employee. It was an isolated statement within a standardized form. There is no evidence in the record that Geneva broadcasts this termination form to a wider audience. Nor, as the trial court points out, is there any evidence that a no-rehire recommendation definitively prohibits Byrne from working at any other UHHS facility. Finally, the absence of verifiable facts included in the recommendation puts the reader on notice that the recommendation is the supervisor's opinion.

{¶ 25} We acknowledge Byrne's attempt to paint a picture of the no-rehire recommendation being the culmination of Waller's personal vendetta against her. The undisputed facts of this case do not support this argument. The decision to recommend against rehiring Byrne came from Carlson, Van Stratton, and Waller, who discussed the situation and recommendation. Byrne did not identify evidence contradicting Carlson's testimony that he and Van Stratton were involved in the decision-making process. Even if we consider Byrne's argument, the potential motive of Waller is irrelevant to our legal conclusion because Waller's motive is not a factor to consider in determining whether the statement is one of opinion or fact. Pernicious opinions generally tend to stem from ill will. A malicious motive does not transform an opinion into a defamatory statement.

{¶ 26} In considering the totality of the circumstances and based on the undisputed material facts, the no-rehire recommendation is as a matter of law a statement of opinion, not fact. None of the *Scott* factors weigh in favor of finding the contrary. Determining whether the statement was one of fact or opinion is the threshold issue. The trial court correctly found the statement to be one of opinion and therefore did not err in granting summary judgment in favor of appellees upon Byrne's defamation claim. Byrne's first assignment of error is overruled.

{¶ 27} Byrne's second assignment of error challenges the propriety of the trial court's decision to grant summary judgment in favor of appellees upon Byrne's tortious interference claim. We find no merit to this argument.

{¶ 28} To prevail on a claim for tortious interference with a business relationship, Byrne must prove the following: (1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages. *Castle Hill Holdings, LLC v. Al Hut, Inc.*, Cuyahoga App. No. 86442, 2006-Ohio-1353, ¶ 46.

{¶ 29} The trial court found that Byrne failed to present any evidence to substantiate the third and fifth prong. The trial court was correct in granting judgment in favor of appellees; however, we affirm based specifically on the more fundamental reason. Byrne argues that "there is ample proof [in the record,] that [a]ppellees engaged in tortious interference with [a]ppellant's *future* prospective employment by the defamatory 'no-rehire' entry." (Emphasis added.) Byrne has not offered any argument, let alone evidence, that a prospective business relationship existed with which appellees could have interfered.[1] It is not enough to claim that the no-rehire statement could potentially interfere with a future prospective employment opportunity. The potential for it to occur does not give rise to a cognizable claim.

---

[1] The record includes some discussions indicating that Byrne applied for other positions within UHHS on three occasions. Even if we assume that she was denied those opportunities solely based on the no-rehire recommendation, we cannot conclude those would support a tortious interference claim. The record reflects that UHHS facilities used the no-rehire recommendation internally. Under Ohio law, a claim that a party tortiously interferes with their own contract or business relationship is not a cognizable one. *Cook v. Wal-Mart, Inc.*, Cuyahoga App. No. 79451, 2002-Ohio-973, ¶ 28.

{¶ 30} Regardless, we also agree with appellees that Byrne's claim fails because she has not introduced any evidence of damages. The record reflects that upon resigning from Geneva, Byrne immediately started employment elsewhere and has been employed ever since. She raises no issues with pay disparities and therefore has not identified any evidence tending to prove the element of damages for the tortious interference claim. There being no genuine issues of material fact, we find that the trial court did not err in granting summary judgment in favor of appellees upon Byrne's tortious interference claim. Her second assignment of error is overruled.

{¶ 31} Byrne's third assignment of error argues that the trial court erred in granting summary judgment upon her false light claim against appellees. We find no merit to her third assignment of error.

{¶ 32} In order to prevail on a false light claim, a defendant may be liable for "[giving] publicity to a matter concerning [the plaintiff] that places [her] before the public in a false light * * * if (a) the false light in which the [plaintiff] was placed would be highly offensive to a reasonable person, and (b) the [defendant] had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed." *Welling v. Weinfeld*, 113 Ohio St.3d 464, 473, 2007-Ohio-2451, 866 N.E.2d 1051. Giving publicity to a statement is more narrowly defined than the publication requirement for defamation, which only requires a communication to a third party. Publicity means that the "matter is made public, by communicating it to the public at large, or to so many persons that the matter must be

regarded as substantially certain to become one of public knowledge. * * * [It is a] communication that reaches, or is sure to reach, the public." Id. at 471-472.

{¶ 33} Byrne argues that appellees disseminated the no-rehire recommendation to the "public that counted, namely to [a]ppellees and other prospective employers." We first note that there is no evidence that the recommendation was sent to any other employer. The record reflects that the recommendation was kept internally for UHHS's use. In light of that fact, we cannot say that the statement was given publicity. It is not a statement that was substantially certain to become one of public knowledge. It is not even certain that UHHS employees in general would be privy to the information. Nevertheless, there is no evidence that the public at large was aware or had access to the information on the termination form. The evidence established that it was only used for UHHS hiring purposes. The trial court, therefore, did not err in granting summary judgment upon Byrne's false light claim, and her third assignment of error is overruled.

{¶ 34} In light of the undisputed, material facts, we find that reasonable minds could only come to one conclusion adverse to Byrne. Appellees met their initial burden of identifying the absence of material fact on essential elements of Byrne's claims. Byrne failed to identify genuine issues of material fact on the above-mentioned elements of her claims. The trial court, therefore, did not err in granting summary judgment in favor of appellees and against Byrne on all claims.

{¶ 35} We affirm the decision of the trial court.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

SEAN C. GALLAGHER, JUDGE

JAMES J. SWEENEY, P.J., and
COLLEEN CONWAY COONEY, J., CONCUR

**APPENDIX**

Assignments of Error:

I. "Where a highly competent and experienced RN (Registered Nurse) for over 20 years, who is also an RNFA (Registered Nurse First Assistant) and a CNOR (Certified Nurse Operating Room), voluntarily resigns from her employment at a hospital in the absence of any threat that the employer might or would terminate her for any reasons and where the employer acknowledges that her job performance was neither deficient nor unsatisfactory and where there was no reasonable or good faith reason to question her competence, professionalism, conduct or future employability, it is actionable defamation per se for her immediate supervisor, after her voluntary resignation, to falsely and permanently publish on her employment record 'Do Not Recommend for Rehire,' where the only basis for her immediate supervisor to do so was to falsely and maliciously damage her prospects for future employment, solely because she accurately reported serious improprieties of a manager who wrongfully attempted to manipulate the advancement of the immediate supervisor to a position for which the immediate supervisor lacked the required operating room credentials, experience and qualifications, under circumstances where the immediate supervisor had an ongoing romantic relationship with that manager who, as a result of the reports of misconduct made about him by the nurse-employee, was separated from employment at the hospital to the great distress of the immediate supervisor who, in turn, was deemed ineligible for the operating room position."

II.     "Based upon the aforementioned circumstances, such misconduct constitutes a cognizable claim for tortious interference with prospective business relations."

III.     "Based upon the aforementioned circumstances, such misconduct constitutes a cognizable claim for misrepresentation in a public false light."